John A. HINCHEY, Plaintiff,

v.

NYNEX CORPORATION and Telesector
Resources Group, Inc. Defendants.

No. CIV.A. 96–10032–GAO.

United States District Court,
D. Massachusetts.

Sept. 12, 1997.

Kevin M. Akre, Salem, MA, for Plaintiff.

Amy D. Seifer, Michael J. Tuteur, Epstein, Becker & Green, P.C., Barry A. Guryan, Karen K. Burns, Epstein Becker & Green, P.C., Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiff, John A. Hinchey ("Hinchey"), filed this suit against NYNEX Corporation ("NYNEX") and Telesector Resources Group, Inc. ("TRG") for damages arising from his allegedly wrongful termination. Both defendants have moved for summary judgment. For the reasons stated below, their motions are granted, and the action is dismissed.

### Background

Stated favorably to the plaintiff, the record discloses the following facts: Hinchey began working for the defendants in October 1965.[1] He worked in several technical management positions, receiving positive evaluations. When he was terminated in October 1993, he had attained the position of Director of Tech-

---

1. Telesector Resources Group, Inc. is a wholly-owned subsidiary of NYNEX Corporation. NYNEX was formed by the merger of New Eng- land Telephone Co. and New York Telephone Co. in 1986. The defendants will be referred to collectively as "NYNEX" or "the Company."

nical Support in the Information Services Organization within TRG. Hinchey did not have a written employment agreement, and he was consequently an employee at will.

On April 15, 1983, New England Telephone Co. (Hinchey's employer at the time) distributed to its employees a "Code of Business Conduct" (the "Code") which stated, in essence, that honesty and responsibility were required from both the Company and its employees. Particularly relevant to this action, the 1983 Code included a provision that guaranteed employees protection if they were to report violations or abuses of the Code. Employees were expected to acknowledge their agreement with the Code by signing it. Hinchey signed the Code but added the following statement:

> I love the Bell System and New England Tel Co, but I am not "satisfied" with my progress to date and cannot, in conscience fully support all existing interpretations of corporate policy. Therefore I cannot exclude the possibility of initiating external review of these concerns and situations. However, my objective continues to be to work toward the betterment of the Company as well as myself.

In 1992 and 1993, the Code was revised, and Hinchey was provided with revised editions. As revised, the Code contained an express disclaimer that it constituted a contract between the Company and an employee.

In 1992, NYNEX implemented a "Force Management Plan" (the "Plan") which set out guidelines for labor reductions among management staff. Under the Plan, "teams" would be set up to evaluate the skills, knowledge, experience, performance, and potential ability of management employees in a unit before making any force reductions. A Supervisor's Guide was issued to supervisors to assist them in the evaluation process.

In 1992, Hinchey began to have discussions with his supervisor, Joseph Castellano, about what Hinchey alleged to be "business and procurement irregularities" within NYNEX. According to Hinchey, Castellano took no action to address Hinchey's concerns and, indeed, personally approved and perpetrated many of the abuses that Hinchey identified.

Hinchey received a negative performance appraisal for 1992, and so in early 1993, he initiated talks with Castellano about a possible "voluntary separation" plan. On July 19, 1993, Hinchey arranged a meeting with NYNEX's vice-chairman, Ivan Seidenberg, so that he could present evidence of the alleged irregularities that Castellano was refusing to pay attention to. On that same day, Castellano called Hinchey and informed him that the terms he had requested for his voluntary separation plan had been approved, including his request that an additional two years of service be credited toward his pension.

In a meeting with Castellano on August 5, 1993, Hinchey was terminated. Hinchey was told that he would receive a full pension plus a year's separation payment. Castellano also promised him that he would receive the two years' net credited service he requested. After he was terminated, Hinchey cancelled his meeting with Seidenberg. Hinchey did not receive the benefits that he says Castellano promised him.

### Discussion

In his seventeen-count complaint, Hinchey brings the following claims against NYNEX: breach of contract, promissory estoppel, intentional misrepresentation, fraud and deceit, negligent misrepresentation, wrongful discharge in violation of public policy, and intentional and negligent infliction of emotional distress.

*Breach of contract claims*

■ Hinchey's contract claims are based on alleged violations of the terms of the various versions of the Code and of the Plan, as well as the oral promises by Castellano to give him the credited service increase for his pension. Hinchey contends that the 1983 Code and the subsequent editions created implied contracts, and therefore, the provisions in each edition protecting employees who report abuses of the Code are enforceable against NYNEX. He claims that his discharge was in retaliation for his report of internal abuses to Castellano and his attempted report of them to Seidenberg.

■ In determining whether an employee manual or other similar document is binding

as a contract, the central inquiry is whether, under the circumstances, the employee reasonably believed that the terms of the document "constituted the terms or conditions of employment, equally binding on employee and employer." *Derrig v. Wal–Mart Stores, Inc.*, 942 F.Supp. 49, 55 (D.Mass.1996) (citing *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 664 N.E.2d 843, 848–49 (1996)). Hinchey cannot claim that he reasonably believed the terms of the 1983 Code were "equally binding" on him and the Company. He added a statement before signing that withheld his assent from the full terms of the Code.[2] Either the Code is binding on both NYNEX and Hinchey, or it is binding on neither. *See O'Brien*, 664 N.E.2d at 849 ("[The plaintiff] cannot assert a right against unfair treatment under one part of [the] employment contract and fail to follow procedures set forth in another part of that contract that could provide relief from that unfair treatment.") To the extent the subsequent Codes are derivative of the original 1983 Code, the same analysis pertains to them, and Hinchey's reservation prevented them from amounting to binding contracts as well.

Moreover, other characteristics of the Codes and the circumstances under which they were issued indicate that they cannot be the basis for a binding contract. See *Jackson v. Action for Boston Community Dev., Inc.*, 403 Mass. 8, 525 N.E.2d 411 (1988). First, there is no evidence of any negotiation between NYNEX and its employees in the preparation of any edition of the Codes. They appear to be management directives, not agreements. Second, the 1992 and 1993 versions contained explicit statements disclaiming any contract status.[3] Finally,

NYNEX retained the right to modify the Code unilaterally, as it obviously did by producing the 1992 and 1993 versions.

The Plan similarly cannot be the basis of an enforceable contract. There is no evidence that the Plan was designed to do anything more than provide guidelines for force reduction procedures. The Supervisor's Guide, as its name implies, was provided to supervisors to assist them in implementing the employee assessments. Under these circumstances, Hinchey could not reasonably believe that the Plan set binding terms for his employment.

Finally, Hinchey's claim for breach of contract based on the alleged oral promises made by Castellano must also be dismissed.[4] To substantiate a claim for breach of contract, Hinchey must prove that Castellano's alleged promises were supported by consideration. In some circumstances, consideration might be furnished by the employee's continuing employment, but here, of course, that is not the case. Castellano's promise did not induce Hinchey to stay on; to the contrary, it was made as he was being shown the door. Hinchey neither promised nor gave anything of value to make the unilateral promise into a contract. The contract claims must be dismissed.

*Promissory estoppel claims*

To establish a claim for promissory estoppel, Hinchey must prove that NYNEX made a representation which was intended to induce action or specific inaction from him, that he reasonably relied on the representation in taking action, and that, as a result, he suffered a detriment. See *Rooney v. Paul*

2. The language of his statement is vague, and it cannot reasonably be read as a negotiated exemption to a specific provision. Rather, it appears to be a statement of general exception, leaving him the option in the future to agree or disagree with the document.

3. The original Code was issued in 1983 before the Supreme Judicial Court opined in *Jackson*, 525 N.E.2d at 415, that personnel manuals can in some instances form the basis of a binding contract. Since *Jackson*, employers (including NYNEX, apparently) have been more careful to delimit the status of the employee manuals they

issue by including language that the manuals are not intended to create contract rights. Because the 1983 Code was written before *Jackson*, the absence of such a statement from its provisions does not have the same significance its omission might have in a post-*Jackson* manual.

4. In his complaint, Hinchey refers only to promises allegedly made after he was already terminated. For purposes of this motion, the Court also considers Hinchey's allegations (made in his motion papers) that Castellano made promises to him *before* he was terminated.

*D. Osborne Desk Co.,* 38 Mass.App.Ct. 82, 645 N.E.2d 50 (1995). Hinchey's promissory estoppel claims based on the Plan and the oral promises must be dismissed because Hinchey did not rely on them to his detriment. He has not alleged that he would have acted differently had these representations not been made.

■ As to the provisions within the Codes, Hinchey's claim fails because his activities fell outside of the scope of the protection promised by NYNEX. Though Hinchey now claims that he was going to inform Seidenberg about antitrust and procurement abuses within NYNEX, it is evident from the documents that Hinchey sent to Seidenberg shortly after his termination (which documents are in the record) that Hinchey intended only to report technology decisions which Hinchey believed to be inefficient and wasteful. For example, Hinchey strongly opposed NYNEX's decision to invest in software development products collectively referred to as CASE tools (Computer Assisted Software Engineering). He wrote to Seidenberg, "Managers and non technical charlatans who had never deployed a major commercial application, were making reckless and irresponsible acquisitions based purely on pretty pictures and salesmen's hype." Compl., Ex. 13 at 4.

There are numerous other instances of Hinchey's disagreement with technical management decisions made by NYNEX. Though he characterizes these decisions as "gross negligence," it is clear that they were discretionary and did not violate the Code. Hinchey's complaints about them were not the kinds of complaints the Code gave protection to. So if, as Hinchey claims, he was terminated for attempting to make these complaints to Seidenberg, his termination was not contrary to the "promise" in the Codes.

*Misrepresentation, fraud and deceit*

■ In his third set of claims, Hinchey contends that NYNEX misrepresented the terms of the Codes and the Plan, as well as its intent to increase his net credited service and its evaluation of his general career status. To prove a claim of intentional misrepresentation, Hinchey must show that

NYNEX made a false representation of material fact upon which NYNEX expected him to act, that NYNEX knew or should have known that the representation was false at the time it was made, and that he reasonably relied on the misrepresentation to his detriment. *See Bolen v. Paragon Plastics, Inc.,* 754 F.Supp. 221 (D.Mass.1990).

■ The problem with all these claims is that Hinchey's complaint is not that he was told *facts* that were false, but rather that he was given false *promises,* that is, that he was promised certain things—protection from retaliation, additional service credits for his pension, etc.—and that NYNEX failed to live up to the promises. A statement that is promissory in nature or that amounts to an opinion about future events is not actionable as a misrepresentation. *See Saxon Theatre Corp. of Boston v. Sage,* 347 Mass. 662, 200 N.E.2d 241, 245 (1964). Hinchey offers no evidence that NYNEX falsely made the promises with the intention *at the time* never to fulfill them. *See Restatement (Second) of Torts* § 526(a) (1977).

Further, as to the alleged misrepresentations concerning the Plan and the net credited services increase, Hinchey has not shown that he in any way relied on these representations to his detriment. Finally, the alleged misrepresentations about his career status were not specific enough so that Hinchey could have reasonably relied on them. Comments by Castellano that Hinchey was a valued employee in good standing were too general to justify Hinchey's reliance. *See Saxon Theatre Corp.,* 200 N.E.2d at 244. Thus, summary judgment must be granted on these counts.

*Public policy wrongful discharge*

■ In Count XV, Hinchey alleges that his termination constituted a public policy wrongful discharge. Massachusetts law recognizes a cause of action for employees who are terminated for "asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or refusing to do that which the law forbids (e.g., committing perjury)." *Smith–Pfeffer v. Superintendent, Walter E. Fernald State School,* 404

Mass. 145, 533 N.E.2d 1368, 1371 (1989). None of these circumstances are applicable here.

 Hinchey claims that he was fired for trying to report NYNEX's violations of antitrust and other laws.[5] But papers submitted by Hinchey to Seidenberg, included in the record, show that the alleged violations were no more than Hinchey's disagreements with decisions made by NYNEX management. The public policy exception to the at-will discharge rule does not protect employees who make internal complaints about company policies or the violation of company rules. *Shea v. Emmanuel College*, 425 Mass. 761, 682 N.E.2d 1348, 1350 (1997).

Nor do Hinchey's actions qualify as protectable "important public deeds." *See Flesner v. Technical Communications Corp.*, 410 Mass. 805, 575 N.E.2d 1107, 1111 (1991) (cooperating with an ongoing governmental investigation is a protected public deed, even if such cooperation is not required by law); *King v. Driscoll*, 418 Mass. 576, 638 N.E.2d 488, 492 (1994) ("[T]he internal administration, policy, functioning, and other matters of an organization cannot be the basis for a public policy exception to the general rule that at-will employees are terminable at any time with or without cause."). For these reasons, NYNEX is granted summary judgment on Hinchey's claim of wrongful discharge.

*Negligent or intentional infliction of emotional distress*

 Hinchey's remaining claims are that NYNEX negligently or intentionally caused him emotional distress. Massachusetts law is clear that an employee's claims for emotional distress are barred by the exclusivity provisions of the Workmen's Compensation Act. *See* Mass. Gen. L. ch. 152, § 24; *Green v. Wyman–Gordon Co.*, 422 Mass. 551, 664 N.E.2d 808, 813–814 (1996) (claim for emotional injuries which were the result of bona fide personnel actions are

barred by the exclusivity provision of the Workmen's Compensation Act).

For these reasons, the defendants' motions for summary judgment are granted, and the action is hereby dismissed.

SO ORDERED.

---

5. Specifically, he alleges that NYNEX "caused to purchase supplies and materials from unqualified over priced and/or extraneous vendors in violation of applicable regulations and law even though significantly superior life cycle price/performance alternatives were readily available." As a result of the hiring of "superfluous/less qualified vendors," ratepayers and stockholders suffered "economic detriment." Compl. ¶¶ 116–17.