SONESTA INTERNATIONAL HOTELS CORPORATION & another[1]
*vs.* CENTRAL FLORIDA INVESTMENTS, INC.

No. 97-P-441.

Suffolk. December 9, 1998. - June 23, 1999.

Present: JACOBS, KAPLAN, & GILLERMAN, JJ.

*Contract,* Performance and breach, Damages. *Damages,* Breach of contract. *Consumer Protection Act,* Unfair or deceptive act. *Jurisdiction,* Personal, Long-arm statute. *Due Process of Law,* Jurisdiction over nonresident.

In an action for breach of contract, the evidence supported the award of damages. [157]

In an action alleging violation of G. L. c. 93A, § 11, the judge correctly ruled that the defendant had carried its burden of proving that the wrongful conduct did not occur primarily and substantially within the Commonwealth. [157-160]

In an action for breach of contract brought by a Massachusetts corporation against a Florida corporation, the defendant's contacts with the plaintiffs were sufficient to support the exercise of personal jurisdiction over it, and the defendant did not show that the assertion of personal jurisdiction over it was unreasonable. [160-163]

CIVIL ACTION commenced in the Boston Municipal Court Department on June 16, 1994.

On removal to the Superior Court Department, the case was tried before *Herman J. Smith, Jr.,* J.

*Marc Redlich* for the plaintiffs.

*Kevin Hern, Jr.,* for the defendant.

KAPLAN, J. The plaintiffs, Sonesta International Hotels Corporation and Sonesta Hotels of Florida, Inc. (collectively, Sonesta),[2] commenced this action for breach of contract against

---

[1]Sonesta Hotels of Florida, Inc., a Florida corporation.

[2]Sonesta International Hotels Corporation is a New York corporation with its principal place of business in Massachusetts. Sonesta Hotels of Florida, Inc., is a subsidiary, organized originally to manage the resort in Orlando, the

the defendant Central Florida Investments, Inc. (CFI), in Boston Municipal Court, whence the defendant removed it to Superior Court and then moved to dismiss it for lack of personal jurisdiction over the defendant. Upon consideration of affidavit material on either side, the judge denied the motion. The pleadings, after amendments, and so far as here material, set out claims by Sonesta for breach of contract and for violations of G. L. c. 93A, and a counterclaim by CFI for violations of the same statute. The action was jury tried and the jury returned a verdict on special interrogatories for Sonesta on its claims and against CFI on its counterclaim. The judge, using the jury verdict as advisory on Sonesta's c. 93A claim, said he would have found for Sonesta on that claim and would have doubled the jury's award on the contract claim — were it not for his holding under § 11 that CFI's unfair or deceptive acts or practices did not occur "primarily and substantially" in Massachusetts. The judge allowed Sonesta attorney's fees in accordance with provisions of the contract sued on. CFI's postverdict motions for judgment notwithstanding the verdict, for a new trial, and to alter or amend the judgment were denied. CFI appeals from the judgment for Sonesta entered upon the jury verdict; it does not appeal from the denial of its counterclaim. Sonesta appeals from the denial of its c. 93A claim.

The issues on the cross appeals are three: the damages award for Sonesta for breach of contract; the ruling exempting CFI from Sonesta's c. 93A claim; and the ruling upholding personal jurisdiction over CFI.

*Narrative.* For some years, "Sonesta Villa Resort" in Orlando, Florida, was a Sonesta-flagged hotel, managed on the ground by Sonesta for the owner corporation, Sand Lake Management Company. The owner filed for bankruptcy around September, 1992. The trustee in bankruptcy, about October, 1992, decided to change the management of the hotel and engaged for that purpose Hospitality Management Corporation (HMC). The trustee, however, wanted to retain the Sonesta flagging as well as access to Sonesta's various services. Accordingly, the trustee and Sonesta entered into a "Transition and License Agreement" (Agreement) dated October 21, 1992, of which the principal provisions dealt with the licensing of the trustee, on stated terms of payment, to use the name Sonesta,

---

subject of the instant dispute.

We sometimes use "Sonesta," as the sense will suggest, to signify the recognizable Sonesta flag consisting of name, marks, logo, goodwill, etc.

with associated marks, logo, good will, etc., in connection with the promotion and operation of the hotel.[3] An appendix to the agreement listed the Sonesta services that could be (and were expected to be) designated by HMC as needed.[4]

In June, 1993, CFI, a large "timeshare"[5] operator and developer in Florida and elsewhere, became successor owner of the hotel by purchase at foreclosure. CFI desired to continue the existing arrangements, at least temporarily. On June 15, 1993, CFI, from Orlando, faxed a letter to Sonesta, in Boston, offering in substance to substitute itself for the trustee in the Agreement and to abide by the fees payable until another arrangement might be agreed to. Sonesta agreed to this substitution.

At the end of July, 1993, Sonesta and CFI commenced negotiations, chiefly about revising the fees. Under the Agreement, CFI had agreed to a basic license fee of three percent of room rentals.[6] CFI now proposed, instead, a flat fee of $100,000 a year. Sonesta apparently was amenable to this, provided CFI undertook to make payments quarterly. Sonesta also tendered revised prices for the optional services. With these changes still not agreed to, CFI informed Sonesta in September that it would not make payment under the existing three percent provision. Sonesta asked CFI to confirm that the lapse in payment would be consistent with CFI's planning to follow the proposed quarterly terms. CFI failed to confirm this and failed to pay on the three percent basis. Sonesta wrote to CFI in December, 1993, and January, 1994, but there was never any response or payment.

Sonesta on February 1, 1994, gave notice to CFI of the termination of the Agreement, to be effective on May 5, 1994,

[3]The association with Sonesta was valuable not only because the name had been continuously connected with the hotel, but because the name had wide recognition. At the time of suit, Sonesta owned two hotels and was managing fifteen.

[4]The services, to a considerable extent managed from the Sonesta headquarters in Boston, were listed in detail in the categories: "Reservations," "Sales," "Public Relations," "Other," and "European Sales Representation."

[5]Briefly stated, timeshare operators sell "shares" which give the buyers certain interests in vacation properties with rights of use for stated periods of the year.

[6]This evidently was Sonesta's typical license fee. The rate was based on actual room rentals, not reservations, and excluded extras such as room service fees. The license fee was to be paid monthly, by the 15th, for rentals in the previous month.

ninety days after notice. This was in accordance with the provisions of the Agreement; CFI had a corresponding right to terminate on thirty days' notice. Sonesta acted in part because of CFI's defaults of payment, as well, perhaps, because of CFI's neglects in communicating. So also, learning that CFI intended to take over the management of the hotel from HMC, Sonesta doubted that CFI could maintain a level of operation that would match Sonesta's "upscale" reputation: CFI's experience had been in the rather different field of timesharing.

Upon receiving the notice of termination, CFI called to ask Sonesta to reconsider, but Sonesta refused. On the termination date of May 5, Sonesta ceased taking reservations for the hotel. CFI was obliged by the Agreement to desist after that date from using the name Sonesta or logo, etc., in connection with the hotel or any related services. Sonesta warned CFI on May 10 to comply; if any violations were not remedied by May 12, Sonesta would charge at the rate of $1,500 per day from May 5. CFI complained of this, asked if Sonesta really expected to collect such fees, and finally asked a week's reprieve, which was granted. CFI in fact did not comply; the violations continued in sundry ways over a considerable period of time. On June 16, 1994, Sonesta commenced the present action. (Additional facts will be mentioned where relevant.)

1. *Damage award.* It is clear enough that CFI was in breach of contract. CFI's complaint, that the damages awarded were excessive and not supported by the evidence, is without substance. Of the $213,173.39 found by the jury, $138,173.39 can represent the sum of specific deficits of payment under the terms of the Agreement for license fees, fees for optional services, etc. The balance of some $75,000 can readily be accounted for as damages for the improper uses of the Sonesta symbols and for consequential injuries, all evidently within the judge's instructions. The evidence filling out this balance of $75,000 is not so speculative as to discredit the figure. See *Agoos Leather Co.* v. *American & Foreign Ins. Co.,* 342 Mass. 603, 608 (1961); *Our Lady of the Sea Corp.* v. *Borges,* 40 Mass. App. Ct. 484, 487-488 (1996).[7]

2. *Locus of any c. 93A violations.* The judge was disposed to hold that CFI was in substantive violation of G. L. c. 93A,

---

[7]CFI points to a provision of the Agreement which seems superficially to limit remedies to a declaration and injunctive relief. The point was not raised at trial. See *Knapp Shoes, Inc.* v. *Sylvania Shoe Mfg. Corp.,* 15 F.3d 1222,

§ 11, but found that CFI had sustained the burden of showing the negative of the proposition that "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." Chapter 93A, § 11, eighth par.[8] We accept the judge's findings as to the "nature, extent, and place of performance" of the defendant's acts in the absence of clear error, but whether CFI met the burden is a question of law on which we exercise plenary review. *Play Time, Inc.* v. *LDDS Metromedia Communications, Inc.*, 123 F.3d 23, 32 (1st Cir. 1997), quoting from *Clinton Hosp. Assn.* v. *Corson Group, Inc.*, 907 F.2d 1260, 1264 (1st Cir. 1990).

The judge wrote that "[t]he essence of the defendant's unfair and deceptive actions" consisted of the use of Sonesta's name after the stated termination date and despite warnings to stop. CFI deployed the name on a sign outside the hotel, and used it in trade magazine advertisements and on business checks; its operators used the name in speaking to customers and inquirers. Some improper uses continued for at least a year. Virtually all acts took place in Florida or originated there. The emanations to Massachusetts were rare or insignificant, as when the trade literature bearing the advertisements, in circulating through most of the States and several foreign countries, may have alighted occasionally in Massachusetts. The judge found also, as illicit acts, that CFI entered into the Agreement with the intention not to perform it, and in any case that it wilfully refused to make the contract payments: these acts, too, the judge located in Florida under § 11.

The working out of a theory of ascription of location under the statute is complicated by the varieties of behavior that come into question — verbal misrepresentations may differ for the purpose from breaches of warranties of goods. Then the statute

1226 (1st Cir. 1994). Anyway the provision is inconsistent with other terms of the Agreement that contemplate other relief, including damages.

[8]The fuller text of § 11, eighth par., as amended by St. 1986, c. 363, § 4, reads: "No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth."

itself presents various possible faces.[9] Perhaps the draftsmen (or the Legislature) had in mind, by means of the disincentives of c. 93A, to improve the moral tone of business in the Commonwealth, but were not interested in trying to impose our normative standards on other communities, especially when reaching beyond our borders might dampen the enthusiasm of outsiders to trade here. But there may have been a legislative purpose to protect local business from predacious activity elsewhere that reached into the Commonwealth by causing loss here, a thought that could turn interpretation in another direction. However, if loss to local business were given determinative weight in fixing the location of the wrong, few situations — fewer than seemingly were contemplated by the draftsmen — would be found out of the bounds of Massachusetts under § 11. See *Goldstein Oil Co.* v. *C.K. Smith Co.*, 20 Mass. App. Ct. 243, 249 n.7 (1985); *American Mgmt. Servs., Inc.* v. *George S. May Intl. Co.*, 933 F. Supp. 64, 68 (D. Mass. 1996).

*Bushkin Assocs., Inc.* v. *Raytheon Co.*, 393 Mass. 622, 638-639 (1985), leaves room for emphasis on the place where the acts offensive to the statute occurred or took effect.[10] See *Goldstein Oil Co.* v. *C.K. Smith Co.*, 20 Mass. App. Ct. at 250. Cf. *International Totalizing Sys., Inc.* v. *Pepsi Co.*, 29 Mass. App. Ct. 424, 436 n.19 (1990). The *Bushkin* court also noted the possibility that a "functional approach" might be taken to the locational problem, with the defendant's forbidden acts considered in the broader context of the entire case, in the manner now customary in dealing with questions about the conflict of laws. *Bushkin, supra* at 638-639. Cf. *Choate, Hall & Stewart* v. *SCA Servs., Inc.*, 378 Mass. 535, 541 (1979). This idea was taken up in *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.*, 25 Mass. App. Ct. 302, 308-311 (1988), and has been employed in other decisions. See *Clinton Hosp. Assn.* v. *Corson Group, Inc.*, 907 F.2d at 1265-1267; *Play Time, Inc.* v. *LDDS Metromedia Communications, Inc.*, 123 F.3d at 33; *Roche* v. *Royal Bank of*

---

[9]See *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.*, 25 Mass. App. Ct. 302, 308 n.4 (1988), describing legislative changes in the locational provision from 1967 onward. The basic criterion has remained pretty steady.

[10]In *Bushkin, supra*, an officer of Raytheon, in Massachusetts, made deceptive statements by telephone to the plaintiff in New York; the plaintiff acted on the statements in New York and is said to have suffered his loss in New York. Raytheon sustained its defense under § 3(1)(*b*)(i), which at that time contained the limiting phrase "primarily and substantially within the commonwealth," now found in § 11, eighth par.

*Canada,* 109 F.3d 820, 829 (1st Cir. 1997). The attempts, however, to single out particular factors that might control the functional inquiry and then to place these factors in some order of importance, are necessarily not fully satisfactory. See *Boston Hides & Furs, Ltd.* v. *Sumitomo Bank, Ltd.,* 870 F. Supp. 1153, 1166-1167 (D. Mass. 1994). The trial judge in the present case put stress on the place or places of occurrence of the offending acts, then concluded, more broadly, "using a functional analysis," that "neither the preponderance of wrongful conduct nor the underlying transactions occurred primarily and substantially in Massachusetts." We agree that CFI has carried its burden. There was no error.

3. *Personal jurisdiction.*[11] In June, 1993, CFI's attorney sent a letter by facsimile to Sonesta in Boston asking that Sonesta agree to CFI's taking on the rights and obligations of the bankruptcy trustee under the Agreement. Thereby CFI intentionally initiated a relationship that it understood would involve, and in fact did involve over a period of time, multiple contacts with the Massachusetts-based Sonesta organization. The motion judge, denying CFI's motion under Mass.R.Civ.P. 12(b)(2), 365 Mass. 755 (1974), to dismiss the action for lack of jurisdiction over the person, summarized the features of the Agreement and the connections and contacts as follows:

> "The agreement in question contemplated an ongoing relationship between the parties, namely that Sonesta would continue to provide various marketing services to the resort and would permit the resort to use the Sonesta name, the Sonesta reservation system, and other services. These services would be performed by Sonesta from its offices in Boston. In addition, the resort would send periodic payments to Sonesta in Boston and have contact with Boston when required. It is the failure to make certain of the periodic payments that led to this suit.
>
> "Pursuant to the agreement, the controller of the defendant's resort placed telephone calls to Sonesta's accounting department in Boston on various occasions; the

[11]There is no necessary inconsistency between a negative holding on § 11 location and a holding that personal jurisdiction exists in the action, as the considerations of policy in the two fields are distinct. See *Burnham* v. *Mark IV Homes, Inc.,* 387 Mass. 575, 580 (1982).

General Manager and/or Director of Marketing of the defendant's resort was in regular contact with Sonesta's marketing and advertising department in Boston; and the defendant placed orders from Sonesta's purchasing department in Boston for items needed at the resort. In addition, the defendant sent payments and periodic reports to Sonesta in Massachusetts (or at least until it ceased paying its bills and this suit commenced). In short, there were numerous telephone and written communications sent from the defendant in Florida to the plaintiff in Massachusetts over the course of time."

These observations of the judge, based on the affidavits submitted on the pretrial motion, were confirmed and reinforced by extensive evidence received at trial.

The judge held, and we agree, that the contacts mentioned fell within the broad reach of the clause "transacting any business in this commonwealth" found in the long-arm statute, G. L. c. 223A, § 3(*a*), as inserted by St. 1968, c 760. See *Haddad* v. *Taylor*, 32 Mass. App. Ct. 332, 335 (1992); *United Elec., Radio & Mach. Wkrs.* v. *163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992), appeal after remand, 987 F.2d 39 (1st Cir. 1993). The judge said we do not have here merely an "isolated" transaction, citing *Droukas* v. *Drivers Training Academy, Inc.*, 375 Mass. 149, 151 (1978), or a fortuitous one. He thought *Good Hope Indus., Inc.* v. *Ryder Scott Co.*, 378 Mass. 1, 6 (1979), was comparable.[12] See *Carlson Corp.* v. *University of Vermont*, 380 Mass. 102, 105 (1980); *Tatro* v. *Manor Care, Inc.*, 416 Mass. 763, 767 (1994); *Hahn* v. *Vermont Law Sch.*, 698 F.2d 48, 50-51 (1st Cir. 1983). The case of *Telco Communications, Inc.* v. *New Jersey State Firemen's Mut. Benevolent Assn.*, 41 Mass. App. Ct. 225, 230-231 (1996), relied on by CFI, is distinguished from the present by the paucity of contacts in the Commonwealth and the nearly total concentration of activities in New Jersey, "leaving little by way of a connection of the defendant FMBA with Massachusetts that could qualify

---

[12]In *Good Hope Indus., supra*, a defendant Texas company contracted to appraise natural gas reserves on Texas property leased by a plaintiff corporation with its main office in Springfield, Massachusetts. Most of the work was done in Texas, but the defendant was required to send periodic appraisal reports, as well as monthly invoices, to the plaintiff here. Jurisdiction was sustained.

as a transaction of business in Massachusetts within the scope of § 3(a)."

Constitutional due process requirements have been satisfied here. Through its solicitation of Sonesta and presumed cooperation with Sonesta under the Agreement, CFI "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson* v. *Denckla*, 357 U.S. 235, 253 (1958), and CFI could have " 'reasonably anticipate[d]' out-of-state litigation." *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 474 (1985) (citation omitted).

The dual constitutional elements are "minimum contacts" and "reasonableness." The former is justified thus in *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 291-292 (1980):

> "[M]inimum contacts . . . can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system."

Our comments above about the long-arm statute speak sufficiently to this element. As to "reasonableness," the burden is on the defendant to show the assertion of jurisdiction against it would be unreasonable, see *Burger King, supra* at 477,[13] and the showing would have to take in not only the factor of the defendant's convenience, but also the interests of the plaintiff and the public. *World-Wide Volkswagen, supra* at 292; *Tatro* v. *Manor Care, Inc.,* 416 Mass. at 773. We can note that the trouble to CFI in litigating here appears not to have been overwhelming considering its self-elected involvement with

---

[13]The *Burger King* case, *supra*, resembles the instant case. Plaintiff Burger King, of Florida, franchised its name, goodwill, etc., to the defendant franchisee conducting the restaurant business in Michigan. The plaintiff sued in Florida for breach of the franchise agreement and for trademark infringement in that (among other things) the defendant held itself out as a Burger King after termination of the franchise. Jurisdiction was upheld.

Sonesta in Boston, its other business activities outside Florida, and its size and resources.

*Judgment affirmed.*