**SMITH & CROYLE, LLC and Asesoria Technica, S.A.**

v.

**RIDGEWOOD POWER CORPORATION and Robert E. Swanson**

**and**

**Fleet Bank, NA, as Trustee.**

**No. Civ.A. 98–11727–RGS.**

United States District Court, D. Massachusetts.

Aug. 24, 2000.

Ann Pauly, Alice E. Richmond, Richmond, Pauly & Ault, Boston, MA, for Plaintiff.

Walter E. Judge, Jr., Christopher Roy, David E. Bond, Downs, Rachlin & Martin, Burlington, VT for Defendants.

## MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

This case arises out of a failed attempt to build an electric power plant in Honduras. The venture collapsed when the plant's only prospective customer agreed to be acquired by a competitor. The erstwhile partners, plaintiffs Smith & Croyle, LLC (Smith & Croyle) and Asesoria Technica, S.A. (ATESA) and defendants Ridgewood Power Corporation (Ridgewood) and Robert Swanson point the finger at one another for the debacle. Before the court are the parties' cross-motions for summary judgment.[1]

---

1. On February 4, 2000, the court noticed a May 24 hearing on plaintiffs' motion for summary judgment on Ridgewood's counterclaims. In the interim, defendants filed motions of their own seeking judgment on plaintiffs' Amended Complaint. Plaintiffs responded with a second dispositive motion for summary judgment on Count I of the complaint. At the motion hearing, plaintiffs' counsel stated that she was prepared only to

## FACTUAL BACKGROUND

The material facts are these. Smith and Croyle is a Massachusetts corporation that "develops projects for the generation of energy." *Second Amended Complaint* ¶ 2. In July of 1997, Oscar Alvarez, the head of ATESA, Smith & Croyle's Honduran agent,[2] negotiated a Power Purchase Agreement (PPA) with Industrias Cementeras Hondurenas, S.A. (INCEHSA). The PPA gave Smith & Croyle (ATESA) the exclusive right to build an "in the fence" (that is, on-site) generating station to supply power to a cement-making plant owned by INCEHSA.[3] On September 12, 1997, Alvarez, unbeknownst to Smith & Croyle, signed an "Addendum" to the PPA which provided that "[i]f the financing is not obtained four months after the signing of this addendum, the [PPA] signed by the parties will be deemed invalid and without effects." *Defendants' Exhibit Book II, Ex. G.* James Croyle testified that he only learned of the Addendum in late November of 1997. *Id., Ex. J,* at 92–92.

Ridgewood is a venture capital firm which oversees private investments in power projects in the United States and abroad. Defendant Robert Swanson serves as Ridgewood's president and sole director.[4] In the fall of 1997, Smith & Croyle solicited Ridgewood's help in financing the power station. *See Defendants' Exhibit Book I, Ex. A.* The confidential prospectus Smith & Croyle provided to Ridgewood highlighted the PPA but made no mention of the Ad-

dendum. In October and November of 1997, Donald Stewart and Douglas Wilson, representing Ridgewood, met several times with James Croyle and Frank Smith in Boston to discuss the proposal. On November 14, 1997, the parties signed a Letter Agreement (drafted by Ridgewood) committing Ridgewood to an $8 million financing package.[5] Ridgewood also agreed to make monthly payments of $30,000 to Smith & Croyle.[6] As explained in paragraph 7 of the Letter Agreement:

> Ridgewood will provide certain funding to S & C for the purpose of paying certain development expenses directly related to the Project including engineering, environmental and legal expenses as approved by Ridgewood. Ridgewood will also contribute to the development efforts of S & C which payments will be supported by budgets and will be in the amount of $30,000 per month. At such time as Ridgewood decides to no longer pursue a financing of the project Ridgewood will notify S & C in writing and Ridgewood's obligations under this Paragraph 7 will cease immediately.

*Defendant's Exhibit Book I, Ex. B,* at 4. Under paragraph 8 of the Agreement, Smith & Croyle agreed to grant Ridgewood "an exclusive period" during which it would refrain from soliciting other potential investors. *Id.* The Agreement also stated that "[e]xcept for the obligations in Paragraph 7 and 8, this letter is not in-

---

argue her original motion. Defendants' counsel understood that he was to present his clients' motions, as well as an opposition to both of plaintiffs' dispositive motions. The court entertained arguments consistent with each of the parties' expectations, and will consider plaintiffs' second dispositive motion on the papers. *See* L.R. 7.1(F).

2. In January of 1998, Oscar Alvarez of ATESA and Smith & Croyle formed Alvarez, Smith & Croyle LLC. *Pauly Aff., Ex. 4,* at 3.

3. At the time, the Honduran Military Pension Plan was "in charge" of INCEHSA. *Defendants' Exhibit Book II, Ex. D,* at 92.

4. Plaintiffs have named Swanson in his personal capacity as a defendant.

5. The balance of the electric plant's projected cost of $15.5 million was to be funded by an equipment loan from a third party lender recruited by Ridgewood.

6. Ridgewood also undertook to pay certain of ATESA's expenses, although this was not explicitly stated in the Letter Agreement.

tended to create any obligation which is legally binding on the parties." Id., at 5.

Ridgewood's obligations under the Letter Agreement were contingent upon satisfactory completion of "due diligence."[7] To this end

> [on] November 19, 1997, Don Stewart, together with Oscar Alvarez, Frank Smith, Jim Croyle, Vince Sacchetti and Erika De la Rosa, met with INCEHSA management, including Jaime Kee Ham and Rigoberto Chang Castillo. Mr. Kee Ham and Mr. Chang Castillo informed Don Stewart that INCEHSA badly needed a reliable supply of power and wanted that power as soon as possible. Later, Mr. Stewart was brought to a military base to meet General Mario Hung Pacheco. The General confirmed what Mr. Kee Ham and Chang Castillo had told Mr. Stewart. . . .
>
> On November 20, 1997, Don Stewart was brought to meetings with Javier Atala, the general manager of the Honduran bank, FICOHSA and Edgardo Zepeda of ENEE [the Honduran national utility company].
>
> On November 21, 1997, Don Stewart and Oscar Alvarez met with geotechnical consultants, Geoconsult. Mr. Stewart then left Honduras.

Defendants' Exhibit Book II, Ex. C, at 13. Ridgewood thereafter began making the monthly payments to Smith & Croyle. Ridgewood also made monthly payments to cover the expenses of Alvarez's ATESA office in Tegucigalpa. Id., at 4–5.

Ridgewood was blissfully unaware that the Addendum signed by Alvarez stipulated that the PPA would expire on January 14, 1998.[8] On December 30, 1997, an INCEHSA lawyer faxed Alvarez, reminding him "that financing [must] be closed on 14 January 1998. If not, INCEHSA could get out of the PPA, [with] out any responsibility." Defendants' Exhibit Book II, Ex. G. Alvarez informed Smith & Croyle of the fax. Id., at Ex. H. On January 14, 1998, INCEHSA gave ATESA an extension until February 1 to complete the closing. Id., Ex. N. When Ridgewood learned of the addendum, it approached Caterpillar Financial Corporation to negotiate the equipment loan. Caterpillar was amenable, but the earliest date that Caterpillar would agree to close was in mid-March. From January 27 to 30, 1998. Ridgewood, Caterpillar, Alvarez, Frank Smith and James Croyle met with INCEHSA in Honduras. Alvarez, Smith and Croyle assured Ridgewood "that so long as progress was shown in the direction of a financial closing, . . . the [INCEHSA] deadline would be waived." Id., Ex. A, at 535.

Notwithstanding, on February 4, 1998, INCEHSA's Board of Directors accepted a buyout offer from a French company, La-Farge France S.A. Defendants' Exhibit Book II, Ex. M, at 11. At that point, INCEHSA was "no longer bound by the PPA." Id., Ex. O, at 517–518; Id., Ex. D, at 108.[9] When Ridgewood's Donald Stewart learned that the PPA had terminally expired, he informed Alvarez orally that Ridgewood would cease making monthly payments under the Letter Agreement. Id., at 108–109; Id., Ex. F, at 786; Ex. K, at 786–787. Ridgewood did not, however, give Smith & Croyle written notice of its decision. Ridgewood then attempted unilaterally to salvage its "substantial" invest-

---

**7.** Ridgewood argues that its agreement with plaintiffs was also contingent upon certain modifications being made to the PPA. Plaintiffs do not disagree, but contend that the terms of the PPA were in fact renegotiated.

**8.** Although Ridgewood's principals have no specific recollection of who informed them of the Addendum to the PPA or why the subject arose, Douglas Wilson testified that Ridgewood learned of the Addendum on January 5, 1998. Id., Ex. A, at 518–524. Plaintiffs present no evidence of a material nature disputing Wilson's testimony.

**9.** If, indeed, it ever was. The original, PPA had been renegotiated to incorporate material terms that had been omitted from the original. The parties agree that INCEHSA never signed the revised PPA, although they disagree as to why.

ment in the project. Defendants' Opposition to Summary Judgment, at 6. On May 28, 1998, Stewart submitted a proposal on behalf of Ridgewood to INCEHSA (La-Farge). Pauly Aff., Ex. 5. INCEHSA (La-Farge) was not interested and ended further discussion. Defendants' Exhibit Book II, Ex. M, at 20–22.

Plaintiffs filed this action in August of 1998. In addition to a breach of contract claim (based on Ridgewood's failure to give written notice of the termination of the Letter Agreement), the Amended Complaint alleges that Ridgewood attempted "to develop and finance the INCEHSA Project without [their] participation," thereby interfering with Smith & Croyle's advantageous relationship with INCEH-SA. Second Amended Complaint ¶ 14. The Amended Complaint also alleges an inevitable violation of M.G.L. c. 93A. Ridgewood responded with counterclaims for fraudulent inducement, intentional misrepresentation, negligent misrepresentation, and a breach of contract claim of its own.[10]

*Plaintiffs' Breach of Contract Claim*

It is undisputed that Ridgewood terminated the monthly financing payments to Smith & Croyle without giving the written notice required by Paragraph 8 of the Letter Agreement. Plaintiffs claim that without such notice, they were unable to approach other potential investors in the INCEHSA project. Plaintiffs' Memorandum, at 4. The logic of this argument is not altogether apparent. While Smith & Croyle dispute whether it (as opposed to its agent Alvarez) received oral notice of Ridgewood's decision to terminate the Agreement, it does not dispute the fact that Ridgewood stopped payment under the Agreement on February 1, 1998. At that point, assuming as Smith & Croyle does, that Ridgewood was in breach of the Agreement, it was perfectly free to approach anyone it wanted.

Ridgewood counters that Smith & Croyle breached the Agreement first by failing to disclose the Addendum to the PPA. Ridgewood also contends that Smith & Croyle compounded its breach by allowing the PPA to expire. "Without a PPA, the plaintiffs held no ownership interest in the Project and no exclusive rights to grant Ridgewood. The failure of the PPA was a failure of consideration." Defendants' Opposition, at 11.

■ The debate over who breached first is somewhat beside the point. The essence of the case is very simple. Smith & Croyle offered Ridgewood the following deal. "We have a PPA with INCEHSA. You can participate as an investor if you will pay us for the privilege." Ridgewood accepted and promised the requested financing. Ridgewood also promised to make substantial monthly payments to Smith & Croyle over the anticipated 15 year life of the project. It made the payments until February 1, 1998, when the PPA expired, and the project died with it.

> When two parties have made a bilateral contract for an exchange of equivalent performances to be rendered simultaneously, the two promises are said to be concurrently conditional. The duty of each is conditional upon tender of performance by the other. If supervening events make it impossible for one of the parties to render substantial performance of his promise, two effects are at once produced: the other party is discharged from duty to render the return performance; and his right of action, if he has one, is no longer conditional upon his tendering this return performance.

Corbin, *6 Corbin on Contracts* § 1259 (6th ed.1991). See also *Lafayette Place Associates v. Boston Redevelopment Auth.*, 427 Mass. 509, 519, 694 N.E.2d 820 (1998) ("[O]ne party cannot put the other in de-

---

10. Plaintiffs filed suit originally in the Superior Court. Ridgewood removed the case to the federal court on diversity grounds.

fault unless he is ready, able, and willing to perform").

When INCEHSA repudiated the PPA, the basis of the bargain between Ridgewood and Smith & Croyle evaporated.[11] See Defendants' Exhibit Book II, Ex. L. Without INCEHSA as a customer, everyone agrees that the plant was not viable. While plaintiffs blame Ridgewood's insensitivity to Latin business mores for dampening the enthusiasm of the Honduran interlocutors, there is no evidence that Ridgewood intentionally sabotaged the project or had any incentive to do so. Plaintiffs argument that Ridgewood dragged its feet anticipating that the expiration of the PPA would allow it to appropriate the project flounders on the simple fact that Ridgewood did not learn of the Addendum until nine days before the expiration date came due. See Defendants' Exhibit Book I, Ex. X; Id., Ex. G. If any party was at fault for the collapse of the deal, it was Smith & Croyle for failing to inform Ridgewood of the critical side agreement. To hold Ridgewood liable for continuing payments under contract that was impossible for Smith & Croyle to perform would make no legal or economic sense.

### Defendants' Counterclaims

Plaintiffs contend that Ridgewood's counterclaims must be dismissed because: (1) Ridgewood lacks standing; (2) Ridgewood itself (as opposed to the entities it manages) has not suffered any actual damages; and (3) the counterclaims fail to meet the requirements of Fed.R.Civ.P. 13. Plaintiffs have not otherwise contested the counterclaims on substantive grounds.

### Standing

Plaintiffs contend that all payments in connection with the INCESHA Project were made by Ridgewood Electric Power Trust IV and Ridgewood Electric Power Trust V, and not by Ridgewood itself. By way of background, Ridgewood[12] manages six investment trusts. The trusts, and not Ridgewood, hold title to the power plants that Ridgewood oversees on the investors' behalf. Plaintiffs' Motion for Summary Judgment on Counterclaim, Ex. 2, at 16–17. The INCEHSA Project was funded by Trust V (not Trust IV) and its approximately 1,900 shareholders. Id. at 17–18.[13] Trust V, in addition to "pay[ing] for the actual [INCESHA] power plant, . . . pays for the legal fees and engineering consulting fees and whatever else." Id., Ex. 2 at 82. The expenses for the INCEHSA Project are reflected in Trust V's relevant financial statements, and were reported to the Securities and Exchange Commission (SEC). Id., Ex. 2 at 83, 103.

Form 19–12G filed with the SEC as of April 30 1998, Trust V disclosed that:

> [t]he Trust is . . . participating in the development of and may operate an approximately 20 Megawatt capacity cogeneration station at the INCESHA cement works in Comayagua, Honduras. . . . As of March 31, 1998, a total of $292,000.00 had been expended by the Trust for due diligence and a small amount of development expenses.

The Declaration of Trust for Trust V identifies Ridgewood, which is a Delaware corporation, as its "Managing Shareholder." Section 3.8 of the Declaration of

---

11. LaFarge's agreement with INCEHSA to purchase a majority position in INCEHSA was made on "January 15 or 20, 1998, two to three weeks before making the transfer shares." Defendant's Exhibit Book II, Ex. M, at 68. Fernando Santos, President of LaFarge Central America, testified that thereafter, INCEHSA lost interest in the Project because the prices were "too high" and there was no longer a power shortage problem. Id., at 21–22.

12. On April 20, 1999, Ridgewood Power Corporation merged into Ridgewood Power LLC. "Ridgewood Power LLC succeeded to all rights and liabilities of Ridgewood Power Corporation." Defendants' Exhibit Book I, Ex. Z ¶ 2.

13. Or so Ridgewood contends. In any event, the trust documents of the two Ridgewood entities are identical in all material terms.

Trust for Trust V provides in relevant part:

[w]ith regard to all rights of the Trust and all actions to be taken on its behalf, the Trust, and not the Trustees, nor the Managing Shareholder, nor the Trust's officers and agents, nor the Investors shall be the principal and the Trust shall be entitled as such to the extent permitted by law to enforce the same, collect damages and take all other action. All agreements, obligations and actions of the Trust shall be executed or taken in the name of the Trust, by an appropriate nominee, or by the Corporate Trustee but not in its individual capacity....

Plaintiffs argue that this trust language precludes Ridgewood from asserting claims that belong to Trust V.

The argument, even if superficially valid, is not one for the plaintiffs to raise, but rather one belonging to the shareholders of Trust V. Plaintiffs sued Ridgewood.[14] Ridgewood's counterclaims arise out of the same transaction that forms the basis of the Amended Complaint. Plaintiffs do not dispute that Ridgewood is the managing entity of Trust V and that the Trust V shareholders have ratified Ridgewood's actions on their behalf. The Trust agreed

not to institute a separate legal action against your clients, Smith & Croyle, LLC and Asesoria Tecnica, S.A., with regard to the subject matter of this lawsuit and that it will be bound by any judgment or release in this lawsuit with respect to the liabilities or claims of either Trust.

Defendants' Reply Brief, at Ex. 3. Therefore, Ridgewood's standing to bring the counterclaims is a non-issue.[15]

*Robert Swanson's Motion for Summary Judgment*

■ Swanson asks to be dismissed from the case because it cannot be disputed that he signed the Letter Agreement in his official capacity as president of Ridgewood and not in his individual capacity. The Letter Agreement is printed on Ridgewood Power Corporation letterhead. The Agreement makes thirty-six references to Ridgewood, and no mention of Swanson. Swanson argues persuasively that there is no legal basis for naming him personally,

14. Smith & Croyle and ATESA were thus the appropriate "opposing parties" for purposes of a Fed.R.Civ.P. 13 counterclaim.

15. Ridgewood is entitled to assert claims on behalf of its undisclosed principals under the clear language of Federal Rule of Civil Procedure 17(a).

Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, *a party with whom or in whose name a contract has been made for the benefit of another,* or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification,

joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest. By entering into the Letter Agreement as the agent for Trust V, Ridgewood may also enforce the contract in its own name. See *Groce v. First Nat. Stores, Inc.,* 268 Mass. 210, 213–214, 167 N.E. 308 (1929).

Numerous cases have held that under Rule 17(a), an agent who has contracted in his own name for a disclosed or undisclosed principal, or who has acted as an agent during the course of the transaction involved in the litigation, may sue for damages suffered by the principal. Such an agent is a proper plaintiff even though the damages were sustained solely by the principal, he claims no financial interest in the transaction or litigation, and even though he did not have title to, or more than a transient possessory or custodial interest in, the property forming the subject matter of the dispute.

*Mitsui & Co. v. Puerto Rico Water Resources Authority,* 528 F.Supp. 768, 776 (D.P.R.1981), citing *Prevor–Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc.,* 620 F.2d 1, 4 (1st Cir.1980).

particularly where Ridgewood has provided evidence of its ample capitalization. See Defendants' Exhibit Book I, Ex. Z; Swanson's Reply, at 5–6.[16]

*Ridgewood's Motion for Summary Judgment*

*Chapter 93A*

■ Chapter 93A of the Massachusetts General Laws does not apply to disputes "principally private in nature." *Riseman v. Orion Research, Inc.*, 394 Mass. 311, 313–314, 475 N.E.2d 398 (1985). Under Massachusetts law, partners in a joint venture are precluded from asserting Chapter 93A claims against one another. *Linkage Corp. v. Trustees of Boston University*, 425 Mass. 1, 23, 679 N.E.2d 191 (1997); *Szalla v. Locke*, 421 Mass. 448, 452, 657 N.E.2d 1267 (1995); *Zimmerman v. Bogoff*, 402 Mass. 650, 662–663, 524 N.E.2d 849 (1988). The Letter Agreement between Ridgewood and Smith & Croyle clearly contemplated the establishment of a joint venture. See Defendants' Exhibit Book I, Ex. B, at 2 ("All rights and assets necessary for the construction and operation of the Project will be assigned to and held by a newly created entity which qualifies as a partnership for U.S. tax purposes ["Newco"]. Newco will be operated as a stand alone entity with its own staff and management and will be governed by a management committee having the majority of representatives appointed by Ridgewood and the balance by S & C.") Smith & Croyle therefore may not assert a Chapter 93A claim against Ridgewood based on the Agreement. Moreover, Ridgewood's attempt to salvage the project subsequent to the termination of the PPA was not part of any "transaction" between the parties and is therefore not a proper subject of a Chapter 93A claim. *Linkage Corp.*, 425 Mass. at 23, 679 N.E.2d 191 ("[Chapter 93A, § 11] requires that there be a commercial transaction between a person engaged in trade or commerce [and] another person engaged in trade or commerce").[17]

*Interference With Advantageous Business Relationship*

■ Plaintiffs finally assert that Ridgewood "has intentionally and wilfully acted to cause damage to the Plaintiffs in their lawful business" by "communicating and negotiat[ing] with persons in Honduras and elsewhere connected to the IN-CEHSA Project without informing or including the Plaintiffs." Second Amended Complaint ¶¶ 14 and 18. To state a claim for tortious interference with advantageous business relationships a plaintiff must show: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of that relationship; (3) the defendant's intentional interference in that relationship by improper motive or means; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct. *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812–816, 551 N.E.2d 20 (1990).

The PPA expired because of the plaintiffs' failure to secure the necessary financing by the deadline imposed by the Addendum. Smith & Croyle thereafter had no "relationship" with INCEHSA in which Ridgewood could interfere. Moreover, Ridgewood's post-termination salvage efforts proved fruitless because INCEHSA was not interested in pursuing the deal with plaintiffs, Ridgewood, or anyone else.

---

**16.** While plaintiffs make a tepid "corporate veil" argument, they offer no evidence to meet the twelve factor test set out in *Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14–16 (1st Cir.1985). See also *Spaneas v. Travelers Indemnity Co.*, 423 Mass. 352, 354, 668 N.E.2d 325 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form").

**17.** Defendants also point out that none of the disputed post-termination events occurred "primarily and substantially" in Massachusetts as Chapter 93A requires. Defendants' Memorandum, at 8. See *Sonesta Int'l Hotels Corp. v. Central Florida Investments, Inc.*, 47 Mass.App.Ct. 154, 159–160, 712 N.E.2d 607 (1999).

Plaintiffs therefore suffered no "loss of advantage" because of Ridgewood's acts.[18]

### ORDER.

for the foregoing reason, plaintiffs' Motion for Summary Judgment on Count One of the Amended Complaint is *DENIED*. Plaintiffs' Motion for Summary Judgment on the Defendants' Counterclaims is *DENIED*. Robert Swanson's Motion for Summary Judgment is *ALLOWED*. Ridgewood Power Corporation's Motion for Summary Judgment on Counts I, II, and III of the Amended Complaint is *ALLOWED*.

SO ORDERED.

---

18. "[S]omething more than an intentional interference is required to make out the tort." *United Truck,* 406 Mass. at 815, 551 N.E.2d 20. The tort requires "actual malice" or "a spiteful, malignant purpose, unrelated to the legitimate corporate interest" of a defendant. *King v. Driscoll,* 418 Mass. 576, 587, 638 N.E.2d 488 (1994). Plaintiffs have pointed to nothing suggestive of malicious motive or "unlawful means" in Ridgewood's post-termination dealings with INCEHSA (LaFarge). See *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 272, 571 N.E.2d 1363 (1991).