**Not For Publication in West's Federal Reporter
Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 03-2430

JAMES G. BOYLE and TUCK'S TRUCKS, INC.,

Plaintiffs, Appellants,

v.

DOUGLAS DYNAMICS, LLC, FISHER PLOWS DIVISION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Circuit Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

John J. Kuzinevich for appellants.
Jeffrey M. White with whom William D. Hewitt and Pierce Atwood
were on brief, for appellee.

May 25, 2004

**Per Curiam**.  This business dispute centers on the decision of Douglas Dynamics' Fisher Plows Division (Fisher), a manufacturer of snow plow equipment, to promote J.C. Madigan (Madigan), a truck upfitter located in Ayer, Massachusetts, to be a full distributor of its products.  Tuck's Trucks, Inc. (TTI), another Fisher distributor located in Hudson, Massachusetts, claims that Fisher's promotion of Madigan violated its agreement with Fisher that Fisher would only appoint additional distributors after providing notice to existing distributors and for valid business reasons.

TTI sued Fisher in Massachusetts state court, alleging breach of contract, intentional interference with contract, intentional interference with advantageous relations, fraud, violation of the Massachusetts Trade Practices Act, Mass. Gen. L. ch. 93A, and violation of the Massachusetts Anti-Trust Act, Mass. Gen. L. ch. 93 § 6.  Invoking diversity jurisdiction, Fisher removed the case to the United States District Court for the District of Massachusetts.  After discovery, Fisher moved for summary judgment on all counts.  The district court referred the motion to a magistrate judge who recommended granting it.  The district court agreed and entered final judgment in Fisher's favor. TTI appealed, pursuing only the contract, intentional interference with advantageous relations, fraud, and ch. 93A claims.

Our de novo review of the record and the parties' briefs, see Rathbun v. Autozone, Inc., 361 F.3d 62, 66 (1st Cir. 2004), convinces us that the magistrate judge's thorough opinion correctly analyzes the challenged counts, and we affirm essentially for the reasons stated therein. See Boyle v. Douglas Dynamics, LLC, 292 F. Supp. 2d 198 (D. Mass. 2003). We write mostly to amplify the magistrate judge's rulings, mindful that "[w]here . . . a trial judge astutely takes the measure of a case and hands down a convincing, well-reasoned decision, an appellate court should refrain from writing at length to no other end than to hear its own words resonate." Corrade Betances v. Sea-Land Serv., Inc., 248 F.3d 40, 43 (1st Cir. 2001) (internal citations and quotations omitted).

We sketch only the factual highlights, construing the record in favor of TTI. See Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000). In the fall of 1996, James Boyle began negotiations with Thomas Walsh for Boyle's company, TTI, to purchase Walsh's company, TTSales. TTSales, a General Motors truck dealer, had also sold Fisher plow equipment since the early 1970's. TTSales's distributorship agreement with Fisher, contained in a combination of oral promises and documents, did not limit Fisher's prerogative to appoint other distributors.

In or around 1996, Fisher began discussions with Madigan about becoming a full distributor. When TTSales heard about these

discussions, it told Fisher that it vehemently opposed Madigan's appointment. To placate TTSales, Fisher decided to appoint Madigan only as a "pool distributor." This designation did not give Madigan full authority to sell Fisher products and forced Madigan to purchase some of its Fisher equipment from TTSales or another distributor, Chapdelaine Truck Center.

Before TTI agreed to purchase TTSales in April of 1997, it did not discuss the pending deal with Fisher. TTI understood, however, that it would need to negotiate directly with Fisher to obtain a distributorship because TTSales could not assign its distributorship. Around this time, TTI began discussions with Fisher about becoming a distributor. Fisher stated that it would not begin formal distributorship talks until General Motors had approved TTI as a distributor of its trucks. In the interim, TTI and Fisher had several conversations about the distributorship process. During these conversations, Fisher representatives stated:

- "It's a trust situation. You do the right thing and you continue to do what [TTSales] does, you will have no problems."

- "[TTSales] has done an outstanding job. You continue to do that stuff and you will have no problems."

- "Do what [TTSales] did, and we'll get along just fine because [it] obviously did it right."

-4-

- "Don't let us down and we won't let you down and it makes good sense for everyone."

- The transition "would be seamless. . . Once the credit was approved, it was seamless. There were no issues."

General Motors approved TTI as a distributor in September 1997. TTI then began the Fisher application process. About that time, TTI learned that TTSales did not have a written agreement with Fisher that restricted Fisher's ability to appoint other distributors. Apparently concerned about Fisher's power to appoint other distributors, TTI demanded that TTSales sign an "offset agreement" to compensate it if Fisher appointed another distributor in certain designated towns. Despite TTI's concern, it never discussed the distributor network or Madigan's status with Fisher.

In October 1997, Fisher and TTI met. At this meeting, Fisher's representative stated that it "has had a long and strong relationship with [TTSales] and had no plans to change anything." According to TTI, it already was a distributor by the time of this meeting, Madigan's status was not discussed at this meeting, and it only learned of Madigan's appointment in the summer of 1998. At this meeting, TTI signed Fisher's "Authorized Distributor Code of Ethics and Responsibilities." The Code of Ethics and Responsibilities did not restrict Fisher's ability to appoint other distributors.

TTI's first claim is for breach of contract. TTI asserts that Fisher's "statements to the effect that things [would] remain the same was the factual basis for [the] agreement that Fisher would not change its distributor system without notice and then only for business reasons." The magistrate judge rejected this claim because Fisher's oral statements did not establish an agreement limiting its ability to appoint additional distributors.

The parties agree that, absent a contrary agreement, a manufacturer may choose distributors at will. See Jobbers Warehouse Serv., Inc. v. Maremount Corp., 453 F. Supp. 840, 842 (D. Mass. 1978). Nothing in the discussions highlighted by TTI is sufficiently definite to displace this principle. See Held v. Zamparelli, 431 N.E.2d 961, 962 (Mass. App. Ct. 1982) (stating that oral contract cannot be based on indefinite statements). The discussions between Fisher and TTI concerned only Fisher's inclination to appoint TTI as a distributor. Neither party mentioned the distributor network or Madigan's status. In light of this context, no reasonable fact finder could conclude that Fisher intended its reassuring comments to TTI to limit its ability to appoint other distributors. Moreover, TTI's subsequent demand from TTSales for an "offset agreement" to protect it from losses if Fisher appointed other distributors indicates that TTI understood that Fisher retained the unfettered right to appoint additional distributors. TTI's breach of contract claim is thus supported only

-6-

by placing certain of Fisher's statements out of context and then applying a meaning to them that the parties did not intend.[1]

TTI also asserts that Fisher's appointment of Madigan violated the implied covenant of good faith and fair dealing. This covenant is an implied contractual term that prevents the parties from taking any action to injure the rights of another party to reap the benefits of its contract. See Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991). The "covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." See Uno Restaurants v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004). TTI claims that Fisher violated the covenant by failing to provide adequate notice before appointing Madigan as a distributor. But, as discussed above, Fisher made no express promise to this effect. See supra at 6.

Citing Cherick Distribs., Inc. v. Polar Corp., 669 N.E.2d 218 (Mass. App. Ct. 1996), TTI argues that Fisher's obligation to supply reasonable notice was an implied term of the distributorship agreement. In Cherick, the Massachusetts Appeals Court held that

---

[1] TTI also argues that the "course of dealing" between it and Fisher established an agreement limiting Fisher's ability to appoint distributors. As the magistrate judge correctly concluded, this argument fails because "TTI had no prior relationship with Fisher at all." Boyle, 292 F. Supp. 2d at 209.

-7-

a jury could find that a manufacturer breached the implied covenant of good faith and fair dealing by terminating a distributorship agreement on only four-days notice. Id. at 220. The court ruled that the termination of an at-will distributorship agreement requires reasonable notice and that four-days notice could be deemed unreasonable. Id. The instant case does not implicate Fisher's obligations vis-á-vis TTI's distributorship. Cherick does not hold that a manufacturer must provide notice to its current distributors before appointing a new distributor. Seemingly, in the absence of a statutory command, importing such a notice requirement into distributorship agreements is unwarranted because the harm to an existing distributor caused by the appointment of an additional distributor, if any, typically is not of the same magnitude as the harm caused by the termination of the agreement. In any event, TTI has not provided a reason or cited authority for such a rule. See Piantes v. Pepperidge Farm, Inc., 875 F. Supp. 929, 938 (D. Mass. 1995) (citing cases in which similar implied covenant of good faith and fair dealing claims have been rejected).

TTI's tort claims fare no better. TTI asserts that Fisher wrongfully interfered with its advantageous relationship with Madigan. To prevail on this claim, TTI must show that Fisher acted with an improper motive or by improper means. See United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 23-24 (Mass. 1990). TTI argues that Fisher acted with an improper motive by waiting to

appoint Madigan until TTSales was no longer a distributor, so as not to upset Fisher's longstanding relationship with TTSales. TTI has not set forth any facts showing that Fisher's purpose in promoting Madigan was to harm TTI. Taken in the light most favorable to TTI, the facts show that Fisher had an interest in promoting Madigan when it believed that it could do so without harming its established relationship with TTSales. This was a legitimate business purpose for Fisher. See Smith & Croyle, LLC v. Ridgewood Power Corp., 111 F. Supp. 2d 77, 85 n.18 (D. Mass. 2000) (stating that improper motive cannot be established where defendant acts in pursuit of "legitimate corporate purpose"). That Fisher's action may have also interfered with TTI's future plans for selling products to Madigan does not establish a claim. See Hunneman Real Estate Corp. v. Norwood Realty, Inc., 765 N.E.2d 800, 808 (Mass. App. Ct. 2002) (stating that "something more" than mere interference with relationship is required to prove tort).

TTI also claims that Fisher committed fraud by making assurances that "things would remain the same." We agree with the magistrate judge that TTI cannot rest a fraud claim on Fisher's statements because "they are too general to justify reliance." Hinchey v. Nynex Corp., 979 F. Supp. 40, 44 (D. Mass. 1997). As discussed above, the conversations during which Fisher made the representations did not concern Madigan or even the distribution network generally. See supra at 6-7. While TTI may, in hindsight,

wish that it had discussed Fisher's plans to appoint additional distributors, it did not do so.

TTI's final claim asserts a violation of Mass. Gen. L. ch. 93A. The magistrate judge rejected this claim because there was no evidence that Fisher engaged in deceit or other unfair practices in its dealings with TTI. TTI has not put forward a developed argument challenging this ruling. We therefore affirm the ruling for the reasons stated in the magistrate judge's opinion. See Boyle, 292 F. Supp. 2d at 218-220.

Having considered all of TTI's arguments and finding them to be without merit, we **affirm** the judgment of the district court.