James G. BOYLE and Tuck's
Trucks, Inc.

v.

DOUGLAS DYNAMICS, LLC.,
Fisher Plows Division

No. CIV.A. 00–12629–RGS.

United States District Court,
D. Massachusetts.

Aug. 29, 2003.

John J. Kuzinevich, Dover, MA, for Plaintiffs.

Jeffrey M. White, John J. Aromando, Peter S. Black, William D. Hewitt, Pierce Atwood, Portland, MA, for Defendants.

*MEMORANDUM AND ORDER ON MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION*

STEARNS, District Judge.

Having reviewed the Report and Recommendation and plaintiffs' objections, I see no reason why the carefully explained recommendation of Magistrate Judge Dein should not be adopted. Summary judgment will therefore be granted to defendant Douglas Dynamics, LLC, Fisher Plows Division (Fisher) on all counts of the Complaint.[1] As the Magistrate Judge demonstrates, there was no enforceable

---

1. Plaintiffs do not object to the Magistrate Judge's recommendation with respect to Count II and Count V.

agreement preventing Fisher from appointing J.C. Madigan, Inc. (Madigan) as a full-line distributor of its snow removal equipment, whatever the competitive disadvantage accruing to Tuck's Trucks, Inc. (TTI). Nor have plaintiffs adduced facts sufficient to overcome summary judgment on their tortious interference (Madigan) or fraud and misrepresentation claims. As the Magistrate Judge points out, TTI is unable to show that it even had a business relationship with Madigan, or that Fisher acted with improper motive or means in appointing Madigan. Nor can plaintiffs show that they reasonably on Fisher's generalized statements of goodwill in absorbing the business Tuck's Truck Sales (the undisputed evidence is to the contrary). Finally, plaintiffs have failed to show any conduct on Fisher's part (over and above the failed showing on their fraud and misrepresentation claim) that raises a trial-worthy issue under Chapter 93A.

### ORDER

For the reasons stated by the Magistrate Judge in her Report, the Recommendation is *ADOPTED*. Judgment shall be entered by the Clerk for Fisher on all Counts of the Complaint.

SO ORDERED.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

July 21, 2003

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiffs, James Boyle ("Boyle") and his closely held corporation, Tuck's Trucks, Inc. ("TTI"), brought this suit against the defendant, Douglas Dynamics, LLC, Fisher Plows Division ("Fisher"), a manufacturer of ice and snow equipment, after TTI purchased the assets of a truck dealership located in Hudson, Massachusetts called Tuck's Truck Sales, Inc. ("TTSales") and became an authorized distributor of Fisher's snow removal products.[2] The premise of the plaintiffs' lawsuit is that Fisher breached its distributorship agreement and otherwise acted wrongfully by promoting J.C. Madigan, Inc. ("Madigan"), TTSales' largest customer, from a limited pool distributor to a full-line distributor. As a result, Madigan became TTI's direct competitor as opposed to its largest customer. The plaintiffs allege that Fisher (1) breached the distributorship agreement (Count I), (2) tortiously interfered with the plaintiffs' contract with TTSales (Count II), (3) tortiously interfered with the plaintiffs' advantageous business relationship with Madigan (Count III), (4) violated Mass. Gen. Laws ch. 93A (Count IV), (5) violated Mass. Gen. Laws ch. 93, § 6, the Massachusetts Antitrust Act, (Count V), and (6) is liable for fraud and misrepresentation (Count VI).

Fisher has moved for summary judgment on all six counts of the Complaint. (Docket # 50). For the reasons detailed herein, this court concludes that there were no restrictions on Fisher's ability to promote Madigan to a full-line distributor. As a result, after reviewing the submissions and considering the parties' arguments, this court recommends to the District Judge to whom this case is assigned that Fisher's Motion for Summary Judgment be ALLOWED.

---

**2.** Fisher contends that Boyle lacks standing to pursue the claims alleged in the complaint as all of its agreements were with the corporation. Boyle asserts that the facts relating to this issue are in dispute. Since both plaintiffs have brought all six counts of the complaint jointly, there is no need for the court to reach the standing issue as it will not affect the outcome of the motion for summary judgment. In this Report, references to TTI shall include Boyle unless otherwise indicated.

## II. *STATEMENT OF FACTS* [3]

In ruling on a motion for summary judgment, the court must view "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Bienkowski v. Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002) (quoting *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995)). Applying these principles to the instant case, the relevant facts are as follows:

### Fisher's Distribution System

Fisher manufacturers ice and snow removal equipment, which it sells through a network of distributors, all of whom have to be appointed by Fisher. (Def.'s SMF ¶ 1; Murphy Dep. at 6–7, 13–14).[4] At all relevant times, Fisher had two types of distributors: "pool" distributors and "full" or "full-line" distributors. While the parties dispute whether Fisher actually followed its own distribution system in the case of Madigan (*see* Pls.' RF ¶ 7), the parties agree that the following was the way the system was supposed to work.

A "pool distributor" is affiliated with a truck manufacturer (such as Chevy and General Motors ("GM")) as part of the manufacturers' bailment pool. (Def.'s SMF ¶ 5). In this capacity, the pool distributor accepts trucks from the manufacturer, installs additional equipment on the trucks, and then re-consigns the trucks to other truck dealerships which sell that manufacturer's truck to end-line customers. (*Id.*). Under this arrangement, the only profit a pool distributor receives is on the equipment installed, not from the ultimate sale of the truck. (Murphy Dep. at 51). Fisher pool distributors are authorized to purchase plows and snow removal equipment directly from Fisher for installation on pool vehicles, but not on other vehicles. (Def.'s SMF ¶ 7). If a Fisher pool distributor needed Fisher equipment for a non-pool vehicle (such as a vehicle the pool distributor itself would sell to the end-line user, or a vehicle owned by a customer which was made by a manufacturer with whom the pool distributor did not have a bailment pool relationship), the pool distributor had to purchase such equipment from one of Fisher's full-line distributors. (Def.'s SMF ¶ 7).

In contrast to a "pool distributor," a "full" Fisher distributor is authorized to buy all of its Fisher equipment directly from Fisher, regardless on which vehicle such equipment is to be installed. (Def.'s SMF ¶ 35). Thus, a full-line distributor could buy Fisher equipment directly from

---

3. Although the parties purport to disagree on many facts, after extensive analysis this court has concluded that these disputes are either not genuine or do not involve material facts. The following facts are undisputed unless otherwise noted.

4. In connection with Fisher's motion, the parties submitted several Statements of Material Facts. Fisher's initial statement of facts (Docket # 51) will be referred to as "Def.'s SMF". The plaintiffs' response to these facts, which is found in Docket # 57, will be referred to as "Pls.' RF". In the same document, after responding to the facts asserted by Fisher, the plaintiffs set forth their own additional facts, which will be referred to as "Pls.' AF". Fisher's response to the plaintiffs' response, which is found in Docket # 67, will be referred to as "Def.'s RF." Fisher's response to plaintiffs' additional facts, which is also contained in Docket # 67, will be referred to as "Def.'s RAF."

Fisher also submitted an exhibit entitled "Deposition Transcripts and Exhibits In Support of Defendant's Motion for Summary Judgment" (Docket # 52). This submission contains the depositions and some deposition exhibits of Boyle; Douglas Dynamic's President, James Janik ("Janik"); J.C. Madigan, Inc.'s President, Timothy Madigan ("Mr. Madigan"); Fisher's Director of Sales and Marketing, John Murphy ("Murphy"); Fisher's Regional Sales Manager, David Staples ("Staples"); and the owner of TTSales, Thomas Walsh ("Walsh"), who is also known as "Tuck."

Fisher for its non-pool customers who wanted plows installed on their vehicles. (Def.'s SMF ¶ 31).

### Fisher's Relationship With TTSales

Thomas Walsh ("Walsh"), also known as "Tuck," owned TTSales, a GMC truck and Navistar dealership located in Hudson, Massachusetts. TTSales first began selling Fisher snow removal equipment in the late 1960's or early 1970's. (Def.'s SMF ¶ 2). In the mid–1990's, Fisher upgraded TTSales to a distributor when Fisher lost an existing distributor in the Worcester/Fitchburg area. (Def.'s SMF ¶ 2).

It is undisputed that TTSales did not have a formal, written, distributorship agreement with Fisher. (*See* Boyle Aff.[5] ¶ 16). According to Fisher, all of its distributorship agreements since approximately 1991 have been oral. (Def.'s SMF ¶ 39). However, it is also undisputed that the parties did execute some written agreements. Thus, on or about May 17, 1989, TTSales and Fisher executed a "Fisher Engineering Service Center Agreement" which included a "Marketing and Sales Policy" with the following components: (1) Service Center Qualifications Sheet; (2) Minimum Parts Stocking List for Service Centers; (3) Service Center Contacts; (4) Co-operative Advertising Program; and (5) Yellow Page Program

(collectively the "Sales Policy"). (Boyle Aff. Ex. 3). According to the Sales Policy these "components, . . . together describe the parameters for our mutually beneficial relationship." (*Id.* at p. 1). A similar Sales Policy apparently was executed by TTSales and Fisher in around April 1996 and/or November 1996, along with an "Authorized Distributor Code of Ethics and Responsibilities." (Boyle Aff. Ex. 4). However, nothing in the documents presented to the court expressly addresses the issue of the appointment of distributors.[6] The only even tangential reference is the statement that "Fisher Engineering reserves the right to sell snowplows through authorized O.E.M. Pool Distributors." (Boyle Aff. Exs. 3 and 4 at 1). Both the 1989 and 1996 Sales Policies also contain a "Service Center Qualifications Sheet" which included the prohibition that distributors "[m]ust not sell a competitive line of snowplows." (*Id.*). According to Fisher, however, this provision was not enforced by the company. (Murphy Dep. at 67–68).

Beginning in or around 1996, Fisher began discussing the possible appointment of Madigan, a company located in Ayer, Massachusetts that sells truck equipment, as a distributor. Madigan was a GMC pool distributor, and in the Spring of 1996, Madigan was approved by Chevy as well to be a pool distributor. (Def's. SMF ¶ 4).

**5.** In opposing Fisher's motion, the plaintiffs submitted Boyle's affidavit (Docket # 58) with several documents attached, as well as excerpts from the depositions of Bernard Predham ("Predham"), a former credit and financial accountant at Fisher (Boyle Aff. Ex. 22), and Raymond Littlefield ("Littlefield"), Douglas Dynamic's Vice President of Engineering and the Senior Site Manager for Fisher's Rockland, Maine location. (Boyle Aff. Ex. 23).

**6.** The 1996 document in particular does not appear to be complete, and purports to expire in 1991 although it was signed in 1996. Nevertheless, the parties do not contend that any

specific relevant or controlling documentation has been lost. The plaintiffs make statements such as "Enron meets Whitewater" (Staples Dep. at 38) in accusing Fisher of shredding relevant documents associated with Fisher's market analyses and other issues which Fisher strenuously denies. However, plaintiffs have not filed any motions relating to the alleged spoliation of evidence, nor have they identified any "missing" documents as expressly containing terms regulating or even addressing the right of Fisher to appoint new distributors. (*See* Pls.' AF ¶ 8). Thus, this court finds the generalized claim of alleged destruction of documents to be irrelevant to the motion for summary judgment.

Fisher contends that it had a good business reason for wanting to appoint Madigan as a distributor. (*See* Def.'s SMF ¶ 6). Plaintiffs dispute these facts. (*See* Pls.' RF ¶ 6). Nevertheless, Fisher's business records show that at meetings held between TTSales' then-owner Walsh and Fisher's Regional Sales Manager, David Staples ("Staples") on January 10, 1996 and March 29, 1996, Staples broached the subject of naming Madigan as a distributor, but Walsh was vehemently opposed to any appointment of Madigan, even as a pool distributor. (*See, e.g.,* Boyle Aff. Exs. 16–2, 17–2). In light of Walsh's opposition, on March 29, 1996, Fisher asked Madigan's president, Timothy Madigan ("Mr. Madigan"), if he would agree to being a pool distributor instead of a full distributor, and buy through TTSales for his non-pool vehicles in order to "make it a little easier on us." (Boyle Aff. Ex. 13). Mr. Madigan agreed. (*Id.*)

On April 12, 1996, TTSales was told by Fisher that Fisher "was going to sell Madigan plows for pool trucks and he [Madigan] can buy the rest from either Tuck or Chapdelaine," a competitor of TTSales located in Lunenberg, Massachusetts. (Boyle Aff. Ex. 17–3; Def's. SMF ¶ 8). Walsh was very upset, and "did not miss an expletive in describing everyone at Fisher from the top to the bottom." (Boyle Aff. Ex. 17–3). Nevertheless, the appointment of Madigan as a pool distributor was made. (Def's. SMF ¶ 6). As described above, around this time, on April 23 1996, TTSales and Fisher signed another copy of Fisher's "Marketing and Sales Policy." (Boyle Aff. Ex. 4). Staples visited TTSales again on May 30, 1996, in response to a call from Walsh asking about written distributor agreements. (Boyle Aff. Ex. 17–4). At that time, Walsh was told that Fisher had not had written distributor agreements in 5–6 years. (*Id.*) During this meeting, Walsh again expressed concerns about Madigan. (*Id.*)

### TTSales' Initial Negotiations With Boyle

In late Summer or early Fall of 1996, TTSales began discussing the possibility of selling its assets to Boyle. (Def.'s SMF ¶ 11). TTSales and Boyle executed a Letter of Intent on November 14, 1996. (Def.'s SMF ¶ 13; Boyle Dep. Ex. 6). As a pre-condition to the purchase of assets and real estate described therein, the "Buyers" (Boyle and a to-be-formed corporation) had to be approved by General Motors and Navistar for their truck franchises, and by Fisher as a plow distributor. (Boyle Dep. Ex. 6 at ¶ 7(a)). Prior to signing the Letter of Intent, Boyle had not discussed his potential purchase of TTSales with Fisher. (Boyle Dep. at 69). Boyle did understand, however, that he would need to negotiate directly with Fisher to obtain its approval, and that TTSales could not sell him the distributorship. (*Id.* at 81, 114).

On April 18, 1997, TTSales and Boyle entered into an Asset Purchase Agreement ("APA"). (Def.'s SMF ¶ 14; Boyle Dep. Ex. 7). Pursuant to the APA, TTSales was to:

> assist Buyer in Buyer's application for grant, transfer or assignment of franchise or distributorship agreements with GMC, Navistar and Fisher, and upon the approval of such grant or transfer to terminate, transfer or assign, as appropriate, Seller's franchise or distributorship agreements with GMC, Navistar and Fisher.

(*Id.* at § 6.1(g)). The approval of GMC, Navistar and Fisher was listed as a precondition for closing on the APA as well. (*Id.* at § 9.1(d)). Nevertheless, Boyle did not have any discussions with Fisher before he signed the APA. (Boyle Dep. at 69–70).

Around the time the APA was signed, Walsh's daughter had a serious accident in

California and Walsh went to California to care for her. (Boyle Dep. at 120–21). At that point, Boyle started spending a great deal of time at TTSales daily and "was effectively running the store." (*Id.*). Also around this time, April 1997, Madigan reiterated his interest in becoming a full-line Fisher distributor, but Fisher would not do so "as long as Tuck is there ...." (Boyle Aff. Ex. 15).

### Boyle's Discussions With Fisher

In May/June 1997, Boyle had his first discussion with Fisher about TTI becoming a Fisher distributor. (Boyle Dep. at 111). It was generally agreed and understood that Fisher would not even begin the application process with Boyle's company until General Motors had approved Boyle as a distributor. (*Id.* at 115–16). GM's approval was not obtained until early September 1997. (*Id.* at 116). In the interim, Boyle had several conversations with various Fisher personnel which Boyle contends formed an agreement with Fisher which precluded Fisher from appointing Madigan as a full distributor to compete with TTI. These conversations include the following:

Statements by Ray Littlefield of Fisher that "it's a trust situation. You do the right thing and you continue to do what Tom Walsh does, you will have no problems." (*Id.* at 124).

Statements by Staples and John Murphy, Fisher's Director of Sales and Marketing, to the effect that "Tuck has done an outstanding job. You can continue to do that stuff and you will have no problems." (*Id.* at 125).

Statements by Staples to "[d]o what Tuck did, and we'll get along just fine because he obviously did it right." (*Id.* at 159).

Conversations with Bernard Predham (an accountant at Fisher), Littlefield and Murphy to the effect that "don't let us down and we won't let you down and it makes good business sense for everyone." (*Id.* at 160).

Boyle understood that Fisher "couldn't put anything in writing" but they said "I was to treat them right and they would treat me right ...." (*Id.* at 125).

Boyle "was assured that this would be seamless. No one at the parts counter would ever know whether at this minute in time we work for Tom Walsh and now all of a sudden it's different because Jim Boyle is the new owner. This—once the credit was approved, it was seamless. There were no issues." (*Id.* at 127). (*See* Defendant's Motion for Summary Judgment with Incorporated Memorandum of Law ("Def.'s Mem.") (Docket # 50) at 14; Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Pls.' Opp.") (Docket # 56) at 9–10). Fisher disputes that these statements were ever made but contends that even if the statements were made, such words are insufficient to form a legally enforceable agreement limiting its ability to upgrade Madigan. (Def.'s Mem. at 14).

Plaintiffs contend, and for purposes of this motion for summary judgment the court will deem it to be true, that Fisher decided to make Madigan a distributor in August or September, 1997. (Pls.' AF ¶ 7). Further, according to the plaintiffs, the appointment of Madigan was to take place on October 1, 1997, even if Walsh still owned TTSales. (Pls.' RF ¶ 32). Nevertheless, Fisher tried to "take advantage of the situation with Mr. Boyle" and appointed Madigan concurrently with the sale of TTSales so that Fisher "did not have to deal with Mr. Walsh." (Pls.' AF ¶ 7).[7]

---

**7.** Fisher claims that there was a market need for the appointment of a new distributor, which plaintiffs deny.

### The Fisher Application Process

General Motors approved Boyle as a distributor on or about September 7, 1997. (Boyle Dep. at 116). Boyle then began the application process with Fisher. (*Id.* at 119–20). According to Boyle, he was approved as a distributor by Fisher on September 15, 1997; TTI was incorporated on September 30, 1997; the closing with TTSales took place on October 3, 1997 (though effective October 1, 1997); and Madigan was appointed a full distributor on October 7, 1997. (*See* Pls.' RF ¶¶ 14, 17, 33, 36; Boyle Aff. ¶¶ 6, 7, 12). This chronology is very much in dispute.[8] According to Fisher, the closing between TTSales and TTI took place on October 1, 1997, prior to its approval of TTI as a distributor; Fisher approved Madigan as a distributor on October 1, 1997, after TTSales "terminated" its Fisher distributorship earlier that day; and Fisher appointed TTI as a full distributor on October 7, 1997. (Def.'s SMF ¶¶ 17, 21, 32, 37).

The different chronologies are relevant only if the court finds that there was something in Fisher's distributorship agreement with TTI that prevented it from appointing Madigan as a full distributor. In that case, it would be important whether TTI or Madigan was appointed first by Fisher. In this court's view, however, at no point was there anything in the arrangement between Fisher and Boyle and/or TTI which prevented the appointment of Madigan as a full distributor. Therefore, the dispute regarding the chronology of events is immaterial and does not preclude the entry of summary judgment.

### The APA Closing

After Boyle was appointed a GM distributor in the early part of September 1997, he began the application process with Fisher. Around this time, Boyle learned that, unlike with GM, TTSales had no written distributorship agreement with Fisher. (*See* Boyle Dep. at 111). Boyle and Walsh asked Fisher for a written agreement on various occasions, but they were repeatedly told that no such agreement would be forthcoming. (*See id.* at 122–25). Instead, Boyle had the conversations with Fisher personnel cited above to the effect that the relationship should be one of trust.

Because Fisher would not provide a written distributorship agreement, in late September 1997, Boyle and Walsh began discussing what would eventually become an Offset Agreement. (*Id.* at 141; Boyle Dep. Ex. 13). Its purpose was to protect TTI in the event that Fisher appointed another dealer in certain designated towns within TTI's market area. (Boyle Dep. at 141–42). After considering various alternatives, the parties eventually executed an Offset Agreement, which provided that:

> In the event that during the period from October 1, 1997 through September 30, 1998, (a) Buyer remains an authorized distributor of Fisher plows, sand spreaders and related parts and accessories, and (b) Fisher Engineering permits any person, corporation or other legal entity (Third Party" [sic]) to be an authorized distributor of Fisher plows, sand spreaders and related parts and accessories, and (c) such Third Party opens a place of business for the sale of such products in any of the Massachusetts towns of Acton, Berlin, Bolton, Clinton, Framingham, Hudson, Maynard, Marlboro, Northboro, Shrewsbury, Southboro or Stow, and (d) the sales by Buyer of plow and sand spreader units during such year is less than 534 units, then Buyer shall be entitled ... to offset Fifty Thousand ($50,000.00) Dollars against

---

8. The parties also each charge the other with falsifying documents to support their version of events. (*See, e.g.,* Def.'s RF ¶ 36; Pls.' RF ¶ 36).

amounts due from Buyer to the Corporation under the terms of a certain Consulting and Non-competition Agreement dated as of October 1, 1997 . . . . (Boyle Dep. Ex. 13 at ¶ 2). The Offset Agreement also had a substantively identical provision for the period running from October 1, 1998 through September 30, 1999, the only difference being that in the 1998–1999 clause, the minimum number of sales was 502. (*Id.* at ¶ 3). The maximum amount TTI could receive under the Offset Agreement was $150,000. (*Id.* at ¶ 6).

Despite his concern about the possibility of Fisher appointing a new distributor in his territory, Boyle never specifically discussed the subject with Fisher. (Pls.' RF ¶ 26; Boyle Dep. at 133). Boyle also never discussed Madigan with Fisher, except that Fisher once mentioned that Madigan sold a different manufacturer's spreader which did not please Fisher. (Boyle Dep. at 130, 133). Similarly, Boyle never had any conversations with Madigan prior to the APA closing, and never had any commitment whatsoever from Madigan to purchase any equipment. (*Id.* at 84, 94). He did know, however, that Madigan was a large customer of TTSales and that Walsh had recommended that Boyle keep a sizeable inventory on hand to meet Madigan's needs. (*Id.* at 95). Prior to the closing, Boyle also knew that Madigan was a pool distributor (*Id.* at 85) and that Madigan bought from Chapdelaine, TTSales' competitor, as well as from TTSales. (Pls.' RF ¶ 7).

### Post–Closing Events

The APA and related documents were dated October 1, 1997, but, according to Boyle, were signed on October 3, 1997.

(*See* Pls.' RF ¶ 28). On October 7, 1997 Staples and Murphy met with Boyle and Walsh at the Hudson facility. (Boyle Aff. Ex. 18). A Fisher Sales Call Report for this meeting indicates that Staples and Murphy assured Boyle that "Fisher has had a long + strong relationship with Tuck's + had no plans to change anything." (*Id.*). This Sales Call Report also indicates that during this meeting, Boyle specifically asked when Madigan would become a distributor and was told that Madigan was already "a distributor." (*Id.*). Fisher asserts that TTI was appointed a distributor at this meeting. (Def.'s SMF ¶ 37).

Boyle agrees that this meeting occurred but maintains that he was already approved as a Fisher distributor long before the meeting, and contends that the parties did not discuss the status of Madigan's distributorship. (Boyle Dep at 192–193; Pls.' AF ¶ 9). It is, however, undisputed that on this date, TTI and Fisher signed an "Authorized Distributor Code of Ethics and Responsibilities." (Boyle Aff. Ex. 1). There is no mention in this document of any restrictions on Fisher's authority to appoint distributors. Nor does this document restrict TTI's rights to sell products manufactured by others.

According to Boyle, the first time he learned about Madigan's promotion to a full-line distributor was in May 1998. (Boyle Dep. at 170).[9] At that time, Fisher told TTI's parts manager not to order as much as in the past, since Madigan was a full-line distributor. (*Id.* at 171). Several months later, in May or June 1998, Boyle confirmed this with Staples. (*Id.* at 172).

---

**9.** Although Madigan's purchases were substantially lower after TTI replaced TTSales than in earlier years, Boyle thought that it was because of the lack of snow and the mild winter. (*See* Boyle Dep. at 173–74). Despite this drop in sales to Madigan, TTI has been very successful and is pleased with the Fisher product. (*See* Pls.' RF 38; Boyle Dep. at 175–76, 211).

On October 29, 1998, TTI sent Walsh a letter informing him that Boyle believed TTI was owed money pursuant to the Offset Agreement because Fisher "effective October 7, 1997, has made J.C. Madigan a *full-line distributor*" and TTI had sold below the minimum number of units. (*Id.* at 150–52 & Ex. 14 (emphasis in original)). Boyle's position was that, despite the fact that Madigan is not technically located within the geographic region covered by the Offset Agreement, the agreement still covered Madigan because Ayer, where Madigan is located, is only one town away from three explicitly covered towns. (Boyle Dep at 155).

Litigation ensued over whether TTSales did, in fact, owe the plaintiffs money based on Madigan's upgrade. (*Id.* at 151). Walsh initially agreed to settle the claim for $75,000 because it was unclear if the Offset Agreement actually covered Madigan. (*Id.* at 152–54; Pls.' RF ¶ 29). However, the plaintiffs and Walsh have apparently since recommenced that litigation because Walsh did not think he had the authority to sign the settlement agreement. (Boyle Dep. at 153–54).

At some point after the APA closing, the plaintiffs requested that Fisher allow them to expand their distribution capacity by locating additional facilities in Woburn and/or Methuen. (*Id.* at 218–20, 224–25). However, on October 11, 1999, Fisher denied the request to expand at either location. (Boyle Aff. ¶ 15 & Ex. 21).

The plaintiffs filed this suit on October 29, 2000 in the Massachusetts Superior Court. Fisher removed the matter to this court shortly thereafter. (Docket # 1).[10]

## III. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, ... would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990) (internal citations omitted).

To prevail on a motion for summary judgment, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990). In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (internal citations and quotations omitted).

### B. Breach of Contract

In Count I of the Complaint, plaintiffs allege that Fisher breached the distributorship agreement by appointing Madigan

---

10. Where applicable below, the court will refer to additional facts in connection with the discussion of the plaintiffs' individual claims.

as a full-line distributor. (*See* Complaint ¶¶ 19–25; Pls.' Opp. at 9–11). In addition, according to the plaintiffs, such conduct violated the implied covenant of good faith and fair dealing. (Pls.' Opp. at 9–11). The plaintiffs contend that the terms of the distributorship agreement consisted of the Code of Ethics signed by TTI, the oral statements quoted above allegedly made by Fisher, and the course of conduct between Fisher and its distributors. For its part, Fisher asserts that the parties' agreements do not contain a prohibition precluding the appointment of Madigan. (*See* Def.'s Mem. at 13–14). In the alternative, Fisher argues that any such agreement would be barred by the statute of frauds (*Id.* at 15), and that since Madigan was allegedly appointed a full distributor before TTI, Madigan's appointment could not constitute a breach of TTI's agreement. (*Id.* at 16). While this court does not find these alternative theories persuasive, for the reasons detailed herein, this court does find that the appointment of Madigan was not prohibited by any agreement between TTI and Fisher. Therefore, this court recommends that summary judgment be entered in favor of Fisher on Count I of the Complaint.

### 1. *Terms of the Distributorship Agreement*

"To recover damages in a breach of contract claim, the plaintiff must prove the existence of a valid binding agreement, the defendant's breach thereof, and damages resulting from the breach." *Mass Cash Register, Inc. v. Comtrex Sys. Corp.,* 901 F.Supp. 404, 415 (D.Mass.1995) (citing *Coll v. PB Diagnostic Sys., Inc.,* 50 F.3d 1115, 1122 (1st Cir.1995)). "To create an enforceable contract, the parties must agree on material terms and manifest a present intention to be bound by the agreement." *McCarthy v. Kylberg,* 282 F.3d 70, 72–73 (1st Cir.2002), and cases cited. Thus, the parties must mutually assent to bind themselves to the agreement and the "contract's essential terms must be sufficiently definite so that the nature and extent of the obligations of the parties are ascertainable." *Mass Cash Register, Inc.,* 901 F.Supp. at 416, 417 (internal citations and quotation omitted). All these elements are missing in the instant case.

 As a general statement, absent a specific agreement otherwise, the mere fact that a distributorship agreement exists does not prevent the manufacturer from adding additional distributors in a given area. *See Jobbers Warehouse Serv., Inc. v. Maremont Corp.,* 453 F.Supp. 840, 842 (D.Mass.1978). It is undisputed that there are no written agreements between TTI and Fisher which address Fisher's right to appoint other distributors. The only document on which plaintiffs rely, the Code of Ethics, makes no mention of any such obligation on the part of Fisher—it only addresses the steps the distributor must take to remain in good standing with Fisher. The oral statements on which plaintiffs rely "suggest little more than a casual reassurance" that Fisher hoped to have a good relationship with the new company. *McCarthy v. Kylberg,* 282 F.3d at 73. Based on these general statements, "no reasonable jury could find that the parties intended to create a contract," *id.,* which limited the right of Fisher to appoint distributors, a right which was fundamental to the manufacturer's entire distribution system.

The instant situation differs significantly from that presented in *Situation Mgmt. Sys., Inc. v. Malouf, Inc.,* 430 Mass. 875, 724 N.E.2d 699 (2000), on which plaintiffs rely. In *Situation Mgmt.,* the parties had a 15–year business relationship governed by three written contracts over the years which had basically the same terms. *Id.* at 879, 724 N.E.2d at 703. There were several conversations between the parties

during which they expressly agreed to extend their relationship for five years on the same or substantially similar terms as their prior three agreements. *Id.* These conversations were found to have created an oral contract. In the instant case, however, there were no specific terms addressed orally between the parties, nor were there any written agreements which related to the appointment of distributors which could form the basis of the parties' relationship. There are simply no facts in the record to support a conclusion that an oral agreement precluding the elevation of Madigan as a full distributor was ever reached.

Nor does the record support a conclusion that the parties' "course of dealing" can supply the missing provision. There are situations where a course of dealing may result in an implied contract, but such situations require an extended relationship with a definite pattern of behavior. *See, e.g., General GMC, Inc. v. Volvo White Truck Corp.,* 918 F.2d 306, 309 (1st Cir. 1990) (where parties had an established business relationship, jury might find "that an implied contract may have been developed through the parties' course of dealing" which prevented the termination of a franchise agreement); *Delano Growers' Coop. Winery v. Supreme Wine Co., Inc.,* 393 Mass. 666, 672–73, 473 N.E.2d 1066, 1071 (1985) (where parties used same procedure for processing wine for approximately five years, this established "a course of dealing" which defined the parties' contractual obligations). In the instant case, TTI had no prior relationship with Fisher at all. When TTSales was the distributor, Fisher appointed Madigan as a pool distributor over TTSales' vehement objection. The record does not support a "course of dealing" which limits Fisher's right to add distributors.

Moreover, Boyle never expressly addressed the issue of the possible appointment of other distributors with Fisher at any time prior to the APA closing. In fact, even though Boyle wanted a written agreement with Fisher, and knew before the APA closing that Fisher would not provide such an agreement, Boyle never sought any assurances from Fisher about the very issue he now claims is critical. Similarly, Boyle never took any steps to ensure that Madigan would remain a customer. Despite the fact that Madigan was a large customer of TTSales and Boyle knew that Madigan could, and had, purchased equipment from Chapdelaine, TTI's competitor, Boyle never sought any assurances from Madigan that it would continue to buy from TTI. In short, Boyle never took any steps to make sure that Madigan's business would remain with TTI.

Most tellingly, TTSales and Boyle entered into an Offset Agreement precisely because of Boyle's concerns that Fisher would appoint new distributors and that such appointments might adversely affect TTI's business. Regardless whether the Offset Agreement was intended to cover the appointment of Madigan as a full distributor (and plaintiffs have taken the position in other litigation that Madigan's appointment was covered), it is clearly a recognition of the possibility that Fisher might appoint other distributors. Under such circumstances "no rational juror could conclude that it was objectively reasonable for [Boyle] to believe that" Fisher lacked the right to appoint new distributors. *See Hinchey v. NYNEX Corp.,* 144 F.3d 134, 142 (1st Cir.1998) (summary judgment in favor of defendant on plaintiff's claim of existence of a contract).

Finally, TTI's claim that Fisher breached the implied covenant of good faith and fair dealing by upgrading Madigan to a full-line distributor does not survive Fisher's motion for summary judgment either. In order to establish a breach of the cove-

nant of good faith and fair dealing, a plaintiff must prove "that there existed an enforceable contract between the two parties and that the defendant did something that had 'the effect of destroying or injuring the right of (the plaintiff) to receive the fruits of the contract.'" *Laser Labs, Inc. v. ETL Testing Lab., Inc.,* 29 F.Supp.2d 21, 24 (D.Mass.1998) (quoting *Anthony's Pier Four v. HBC Assoc.,* 411 Mass. 451, 471, 583 N.E.2d 806, 820 (Mass.1991)) (alteration in original). Here, however, Fisher did not deprive TTI of the fruits of its agreement.

As detailed above, the distributorship agreement did not prevent Fisher from increasing its distribution network in general or upgrading Madigan in particular. The plaintiffs simply did not have an enforceable right to have Madigan as a customer. *See, e.g., Piantes v. Pepperidge Farm, Inc.,* 875 F.Supp. 929, 938 (D.Mass. 1995) (rejecting claim where contract did not provide plaintiff franchise distributor with an absolute right to existing customer base and continued employment); *Lohnes v. Level 3 Communications, Inc.,* 272 F.3d 49, 62 (1st Cir.2001) ("[t]he most prominent flaw in the appellant's attempt to wield this club is that he misperceives the fruits of the bargain that he struck .... [T]he fruits of the contract were limited to those enumerated ....").

It is also undisputed that Fisher did not deprive the plaintiffs of any other benefits stemming from the distributorship agreement. In fact, Boyle likes Fisher's product, receives an adequate supply from Fisher, and makes a good profit from selling Fisher's equipment. (Boyle Dep. at 211). For these reasons, the plaintiffs have never sold competing products and have no desire to do so. (*Id.;* Def.'s SMF ¶ 45). Plaintiffs received the fruits of their agreement with Fisher. The implied covenant of good faith and fair dealing does not enable plaintiffs to rewrite their agreement.

In sum, there is no evidence of the parties' mutual assent to an agreement not to appoint Madigan as a full distributor, and the general assurances on which TTI relies are not sufficiently specific to create an enforceable contract. Therefore, this court recommends that summary judgment be entered in favor of Fisher on Count I of the Complaint.[11]

### 2. *Statute of Frauds*

■ Fisher argues, in the alternative, that the plaintiffs' claim of breach of contract must fail as it is barred by the Statute of Frauds under the Uniform Commercial Code ("UCC"), Mass. Gen. Laws ch. 106, § 2–201. Thus, while admitting that it has a distribution agreement with TTI, and that it is an oral agreement, Fisher also contends that any terms of the agreement beyond consummated transactions involving the purchase and sale of equipment are unenforceable absent a writing.[12] (Def.'s Mem. at 15–16). In view of this

**11.** In their complaint, the plaintiffs allege Fisher also breached the distributorship agreement by refusing to allow Boyle to open distributorships in Methuen and/or Woburn. (Compl.¶ 24). However, the plaintiffs have not pursued this claim in opposing the instant motion. Moreover, the record is devoid of any evidence that Fisher was contractually obligated to grant Boyle distribution rights in those areas or even to consider doing so. Therefore, to the extent Count I is based on these allegations, this court also recommends that Fisher's motion for summary judgment be allowed.

**12.** Fisher contends that consummated transactions fall within an exception to the writing requirement of the UCC's Statute of Frauds found at Mass. Gen. Laws ch. 106, § 2–201(c) (an oral agreement is enforceable "(c) with respect to goods for which payment has been made and accepted or which have been received and accepted").

court's conclusion that the distribution agreement did not limit Fisher's right to elevate Madigan to a full distributor, the court does not need to reach the Statute of Frauds issue. If it does, however, this court concludes that Fisher is not entitled to summary judgment on the basis of the Statute of Frauds.

A majority of courts have concluded that the Statute of Frauds found in the UCC is applicable to distributorship agreements, as such hybrid agreements are predominantly for the sale of goods. *See Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F.Supp. at 418–19, and cases cited. Similarly, in the instant case, the parties' relationship centered around Fisher's supplying TTI with equipment, and the other intangible components of the distributorship were incidental to this arrangement. Therefore, the UCC, Mass. Gen. Laws ch. 106, § 2–201, applies to the instant case.

■ There is, however, an exception to the writing requirement of the Statute of Frauds which is applicable here. Mass. Gen. Laws ch. 106, § 2–201(3)(b) provides that no writing is required "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made," however, "the contract is not enforceable under this provision beyond the quantity of goods admitted." This provision has been found sufficient to allow the enforcement of an oral agreement to be an exclusive distributor despite the lack of specific quantities of goods. *Gestetner Corp. v. Case Equip. Co.*, 815 F.2d 806, 809 (1st Cir.1987) (applying identical Maine statute and finding plaintiff's admission in complaint that contract existed was sufficient to overcome statute of frauds defense). Similarly, in the instant case, Fisher's admission that TTI was its distributor, along with its history of filling TTSales' equipment orders, compels the conclusion that the agreement is enforce-able. *Providence Granite Co., Inc. v. Joseph Rugo, Inc.*, 362 Mass. 888, 889, 291 N.E.2d 159, 160 (1972) (finding party's officer's admission in trial testimony that contract existed satisfied section 2–201(3)(b)). Therefore, the UCC Statute of Frauds does not preclude plaintiffs' breach of contract claim.

■ Finally, even if the UCC were not applicable, the non-UCC statute of frauds found in Mass. Gen. Laws ch. 259, § 1 would not bar plaintiffs' claim either. That statute provides that any "agreement that is not to be performed within one year from the making thereof" is invalid unless in writing. Based on Fisher's own contentions, it believed that the distributorship could end at any time. If this is so, then it is axiomatic that the relationship could have terminated as early as the day after it was made, and thus, within one year. *See, e.g., Meng v. Trs. of Boston Univ.*, 44 Mass.App.Ct. 650, 652, 693 N.E.2d 183, 185 (citing, *inter alia, Johnson Clinic, Inc. v. Huffnagle*, 2 Mass.App.Ct. 837, 837, 310 N.E.2d 628, 628–29 (1974) for the proposition that oral at will employment contracts fall outside the statute because the "employer may go out of business" in less than one year), *review denied*, 427 Mass. 1109, 700 N.E.2d 269 (1998).

### 3. *Timing of the Appointment of Madigan*

Finally, Fisher argues in the alternative that TTI was not appointed as a distributor until October 7, 1997 and that Madigan's prior appointment could not, therefore, be in breach of TTI's contract. (*See* Def.'s Mem. at 16). Leaving aside the merits of this contention, the material facts concerning when both Madigan and TTI were appointed are in dispute. Therefore, the argument does not warrant the entry of summary judgment.

In sum, this court finds that TTI and Fisher had an enforceable distributorship agreement. However, the agreement did not limit Fisher's right to appoint Madigan as a full distributor. Therefore, summary judgment should enter in favor of Fisher on Count I of the Complaint.

### C. *Interference With Contractual Relations*

In Count II of the Complaint, plaintiffs contend that Fisher interfered with their contractual relationship with TTSales. For the reasons detailed herein, this court recommends that summary judgment in favor of Fisher be entered on this Count of the Complaint.

It is well settled that to "state a claim for intentional interference with a contract" a plaintiff must prove "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's conduct was for an improper purpose or by improper means; and (4) the plaintiff was harmed by the defendant's actions." *Kelley v. LaForce*, 288 F.3d 1, 13 (1st Cir. 2002) (citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 815, 551 N.E.2d 20, 21, 23 (1990)). By definition, this tort requires that there be a valid underlying contract between the plaintiff and a third party which includes the terms at issue. *See Am. Private Line Serv., Inc. v. Eastern Microwave*, 980 F.2d 33, 35–36 (1st Cir.1992) (upholding defendants' directed verdict where plaintiff failed to establish underlying contract). In the instant case, the plaintiffs have failed to establish several of these elements.

There is no question that the plaintiffs had a contract with TTSales, namely the APA. The plaintiffs' claim must fail, however, because the undisputed facts establish that TTSales did not break the contract. *See, e.g.*, Def.'s SMF ¶ 19 & Pls.' RF ¶ 19 (undisputed that "TTSales per-formed its obligations under the APA and completed the sale of assets to TTI under the APA"); Def.'s SMF ¶ 20 & Pls.' RF ¶ 20 (undisputed that "TTI acquired all of the assets that were transferred from TTSales and undertook all obligations assumed under the APA"). Consequently, no jury could find that Fisher knowingly induced TTSales to breach the APA.

Moreover, it is important to recognize TTSales' limited obligations under the APA vis-à-vis the Fisher distributorship. The assets conveyed do not include a guaranteed Fisher distributorship, a sales territory free from additional competition, or a guaranteed sales base of TTSales' existing customers, including Madigan. In fact, Boyle knew at all times that TTSales could not transfer the Fisher distributorship, and TTSales was only obligated to assist the plaintiffs in applying for a distributorship. (Boyle Dep. Ex. 7 § 6.1(g)). Plaintiffs do not contend that TTSales failed to fulfill this obligations.

Plaintiffs characterize the breach as having Walsh convey assets that "were worth far less than either party contemplated." (Pls.' Opp. at 15). However, as plaintiffs have admitted, Walsh did convey all the assets called for under the agreement. The undisputed facts establish that there was no breach despite Boyle's after-the-fact dissatisfaction with his deal.

For these reasons, plaintiffs' claim of intentional interference should fail, and no further inquiry is necessary. However, the parties do spend a great deal of time addressing the third element of the wrongful interference claim, namely whether Fisher's conduct was for an improper purpose or by improper means. "The propriety of an actor's motives in a particular setting necessarily depends on the attending circumstances, and must be evaluated on a case-by-case basis. The same generally holds true for the evaluation of the

means that an actor relies on to achieve a goal." *G.S. Enter., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 273, 571 N.E.2d 1363, 1370 (1991). Nevertheless, even viewing the facts in a light most favorable to the plaintiffs, the plaintiffs have not established that Fisher acted for an improper purpose or by improper means.

At most, a jury could find that Fisher kept quiet about its intention to appoint Madigan as a full-line distributor until after the APA closed to allow Walsh to sell his excessive inventory, which Madigan would not be buying. Fisher may have acted to help its long-standing customer—Walsh, and to help Madigan who it viewed as having the potential to be a major player in the area. Fisher may have acted in callous disregard of the effect of its conduct on Boyle, with whom it had no real relationship. However, there is no evidence of personal animus toward Boyle, or any improper or unethical conduct which would support a wrongful interference claim. *See Adcom Prod., Inc. v. Konica Bus. Mach. USA, Inc.*, 41 Mass.App.Ct. 101, 105, 668 N.E.2d 866, 869–70 (1996) (concluding motive to hurt satisfies "improper" requirement), *review denied*, 423 Mass. 1111, 672 N.E.2d 539 (1996). If the court were to address the issue of Fisher's motives in connection with the wrongful interference claim, this court concludes that summary judgment should still be entered in favor of Fisher.

**D. *Interference With Advantageous Relationship***

In Count III of their Complaint, plaintiffs contend that Fisher wrongfully interfered with their advantageous business relationship with Madigan. Again, this court recommends that summary judgment in favor of Fisher be entered on this Count of the Complaint.

■ In order to prevail on a tortious interference with business advantage claim, a plaintiff must prove "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) defendant's interference with it through improper motive or means; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." *Am. Private Line Serv., Inc. v. Eastern Microwave, Inc.*, 980 F.2d at 36 (citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 815, 551 N.E.2d 20, 23 (1990)). A plaintiff need not "prove that it had a binding contract," rather a "probable future business relationship anticipating a reasonable expectancy of financial benefit" is sufficient. *Id.* However, the prospective relationship cannot be unrealistically remote. *See Laser Labs v. ETL Testing Lab.*, 29 F.Supp.2d at 23–24 (finding plaintiff's evidence of a "potential" market for its products insufficient to create a prospective advantageous relationship).

■ In the instant case, plaintiffs' claim must fail because it has not established a definite business relationship between TTI and Madigan, and because the undisputed facts establish Fisher did not act with improper motive or means in taking Madigan on as a full-line distributor.

As an initial matter, there was no firm relationship between TTI and Madigan at the time of Madigan's upgrade to a full-line distributor. Boyle had never discussed Fisher's products with Madigan at all before Fisher upgraded Madigan, and had taken no steps to ascertain Madigan's intentions to buy products from TTI. Further, as Boyle knew, Madigan never had any obligation to purchase Fisher products from either TTSales or TTI and did not even have an informal agreement to do so. Even during TTSales' existence, Madigan was purchasing an increasing number of Fisher products from Chapdelaine instead of TTSales. (*See* Def.'s SMF ¶ 8; Pls.' RF

¶ 8). Given the speculative nature of Madigan's future purchases from TTI, Fisher cannot be deemed to have interfered with their relationship.

Furthermore, there is no evidence to support a finding that in hiring Madigan Fisher intended to hurt Boyle. Rather, the undisputed facts establish that Fisher was motivated by a desire to increase its sales. In order to state a claim for wrongful interference, the interference must be "wrongful by some measure beyond the interference itself." *United Truck Leasing Corp. v. Geltman*, 406 Mass. at 816, 551 N.E.2d at 23 (quoting *United Truck Leasing Corp. v. Geltman*, 26 Mass.App. Ct. 847, 852 n. 2, 533 N.E.2d 647, 651 (1989)). Here, there is no evidence that Fisher violated a statute or a rule of common law. "There is no evidence that [Fisher] used threats, misrepresented any facts, defamed anyone, or used any other improper means . . . ." *Id.* at 817, 551 N.E.2d at 24. Under such circumstances, summary judgment on a claim of wrongful interference with advantageous relationship is appropriate. *Id.; see also Am. Private Line Services, Inc. v. Eastern Microwave, Inc.*, 980 F.2d at 36–37 (where sole motivation is a party's "own financial benefit," summary judgment dismissing claim of interference with advantageous relationship affirmed).

## E. *Fraud and Misrepresentation*

In Count VI of the Complaint, plaintiffs contend that Fisher misrepresented the status of their business by making the statements quoted above "all to the effect that when Mr. Boyle bought the business, the Fisher business would remain the same as under Mr. Walsh. There were extensive discussions of a seamless transition and at all times Mr. Boyle was assured that it would be seamless." (Pls.' Mem. at 16). According to the plaintiffs, these statements constitute actionable misrepresentations because

Fisher had already made the decision to upgrade Madigan and "knew that there was to be a material change in its distribution network which would have enormous impact on Mr. Boyle. Instead of either telling him about the upcoming appointment or telling him that Fisher could not comment on its network or future developments in the network, Fisher told Mr. Boyle that things would be the same." *Id.* Plaintiffs' argument must fail, however, because the statements allegedly made by Fisher are too vague to be actionable, and the undisputed facts, including the Offset Agreement, establish that plaintiffs did not rely on any such statements.

"To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment." *Zimmerman v. Kent*, 31 Mass.App.Ct. 72, 77, 575 N.E.2d 70, 74 (1991), and cases cited. Where, as here, there are only non-specific statements of good intentions, the statements are "too general to justify [Boyle's] reliance." *Hinchey v. NYNEX Corp.*, 979 F.Supp. 40, 44 (D.Mass.1997) (finding defendant's statement that plaintiff was "a valued employee in good standing" too general); *accord Bolen v. Paragon Plastics, Inc.*, 754 F.Supp. 221, 226 (D.Mass.1990) ("[o]ne way of evaluating the reasonableness of reliance is by determining if the alleged misrepresentation was sufficiently specific to justify plaintiff's reliance on it") (both citing *Saxon Theatre Corp. of Boston v. Sage*, 347 Mass. 662, 666–67, 200 N.E.2d 241, 244–45 (1964)).

In the instant case, it is too far a stretch of the imagination to conclude from Fisher's alleged statements that it was agreeing to give up its fundamental right to establish a distribution network as it saw fit and was committing itself

not to add any additional distributors, including Madigan. Nothing in Fisher's statements even mentions distributors, Madigan or the distribution network. Plaintiffs admit that before becoming a distributor, they did not have any discussions with Fisher regarding whether Fisher intended to appoint new distributors. Similarly, it is uncontroverted that the plaintiffs never discussed Madigan's status with Fisher before TTI became a distributor. The statements cited by plaintiffs are too general for them to have reasonably relied on them to conclude that Madigan would not be appointed a full-line distributor.

Moreover, the undisputed evidence establishes that plaintiffs did not rely on any alleged statements made by Fisher. The plaintiffs entered into the Offset Agreement with TTSales because of the plaintiffs' concern that Fisher would appoint additional distributors. In other litigation, plaintiffs took the position that the Offset Agreement was intended to cover the elevation of Madigan. Plaintiffs knew they were not going to get a written distributorship agreement from Fisher, and apparently recognized that Fisher had the authority to appoint other distributors. Under such circumstances, plaintiffs' claim for fraud and misrepresentation must fail. *See Carroll v. Xerox Corp.*, 294 F.3d 231, 236, 243 (1st Cir.2002) (where plaintiff told on several occasions that new job was at a lower salary, and signed offer letter so stating, claim of fraud and misrepresentation based on assurance salary would not be reduced dismissed).

Finally, there was no independent reason for Fisher to be obligated to disclose its plans for its distributorship network to plaintiffs. There were no substantive discussions about the network, or Madigan's status, which would require a fuller disclosure of Fisher's plans. *See Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1478 (1st Cir.1996) (only where a party discloses partial information that may be misleading is there a duty to reveal all material facts to avoid deception), and cases cited. In addition, because the relationship (if any) between Fisher and plaintiffs was "at arm's length, it did not give rise to any affirmative obligation to disclose .…" *Sparks v. Fidelity Nat'l Title Ins. Co.*, 294 F.3d 259, 274 (1st Cir.2002). "In the absence of a specific duty to disclose," there is no liability for an omission of information. *Id.* and cases cited.[13]

Fisher does raise two other arguments in support of its motion for summary judgment on this count which this court does not find persuasive. Fisher contends that the alleged statements all related to future performance as opposed to existing facts, and were, therefore, not actionable. Generally, a "statement that is promissory in nature or that amounts to an opinion about future events is not actionable as a misrepresentation." *Hinchey v. NYNEX Corp.*, 979 F.Supp. at 44 (citing *Saxon Theatre Corp. of Boston v. Sage*, 347 Mass. at 667, 200 N.E.2d at 245). However, "[s]tatements of present intention as to future conduct" are redressable if "the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage." *Starr v. Fordham*, 420 Mass. 178, 187, 648 N.E.2d 1261, 1267 (1995) (internal citations and quota-

---

**13.** The plaintiffs allege in passing that because Fisher was "both a lender extending credit and a vendor," it had a special relationship with the plaintiffs obligating Fisher to disclose material facts. (Pls.' Opp. at 13–14). There is nothing in the parties' relationship which would require Fisher to be an active participant in plaintiffs' business affairs. The undisputed facts of this case compel the conclusion that the parties were both sophisticated business entities acting at arms length at all times. The plaintiffs' passing reference to a special relationship is insufficient to trigger additional duties.

tion omitted). Here, plaintiff alleges that at the time Fisher "represented" that things would not change it had already decided to upgrade Madigan. If the alleged representation that "things would not change" could be interpreted to mean that no new distributors would be appointed (which this court does not find), then there is sufficient evidence that the statement of Fisher's "present intention as to future conduct" was false when made, and the issue of Fisher's liability for misrepresentation should go to the jury.

In addition, Fisher argues that plaintiffs knew that Staples, who allegedly made the representations, was not the ultimate decisionmaker on the appointment of distributors, and that it was, therefore, unreasonable for plaintiffs to rely on his comments. (Def.'s Mem. at 31). However, plaintiffs allege that a number of individuals from Fisher participated in the conversations on which plaintiffs base their claim. If the statements are deemed to be actionable (which, again, this court does not find), then the question whether Boyle reasonably relied on the statements based on the declarant's status should be left to the jury.

In sum, because the statements on which plaintiffs are relying are too general to be actionable, and because the undisputed facts establish that plaintiffs did not rely on any such statements, this court recommends that summary judgment be entered in favor of Fisher on plaintiffs' claim of fraud and misrepresentation.

### F. The Massachusetts Antitrust Act

In Count V, the plaintiffs assert that Fisher discourages competition in violation of Mass. Gen. Laws ch. 93, § 6, a provision of the Massachusetts Antitrust Act, by prohibiting its distributors from selling competitors' products. (Compl. ¶¶ 39–42). In support of this claim, the plaintiffs rely on the Service Center Qualifications contained in the Sales Policies, which expressly states that Fisher's distributors cannot sell competitors' plows. Plaintiffs also claim that a Fisher representative reiterated this proscription to Boyle. (Pls.' Opp. at 17–18). According to the plaintiffs, these mandates, in conjunction with Fisher's domination of the market, violate the statute. (Pls.' Opp. at 18). Fisher denies imposing such a restriction on its distributors and contends that there is no evidence that its actions or policies have substantially lessened competition or tended to create a monopoly. (Def.'s Mem. at 32–33; Defendant's Reply Brief in Support of Motion for Summary Judgment ("Def.'s Reply Mem.") (Docket # 66) at 9). Because the plaintiffs have failed to produce any evidence that Fisher's actions have actually discouraged competition, this court recommends that Fisher's motion for summary judgment be allowed on this count.

Pursuant to Mass. Gen. Laws ch. 93, § 6:

[i]t shall be unlawful for any person engaged in trade or commerce, in the course thereof, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, patented or unpatented, for use, consumption or resale in the commonwealth, or fix a price charged therefor, or discount from, or rebate upon, such price on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for sale or such condition, agreement or understanding may be to lessen substantially competition or tend to create a monopoly in any line of trade or commerce in the commonwealth.

The provisions of the Massachusetts Antitrust Act are to be "construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable." Mass. Gen. Laws ch. 93, § 1. The federal antitrust provision most analogous to Mass. Gen. Laws ch. 93, § 6 is section 3 of the Clayton Act, 15 U.S.C. § 14,[14] which, *inter alia*, prohibits exclusive dealing contracts. *Cf. C.R. Swaney Co., Inc. v. Atlas Copco N. Am., Inc.*, CIV. A. No. 85–587–N, 1987 WL 33025, at *17 (D.Mass. Sept.25, 1987) (addressing state and federal anti-trust claims); *Rental Car of N.H., Inc. v. Westinghouse Elec. Corp.*, 496 F.Supp. 373, 379 (D.Mass.1980) (section 3 of Clayton Act prohibits "tying arrangements for sales" and "exclusive dealing contracts").

The "initial requirement" for an unlawful exclusive dealing claim is that the arrangement be "truly an exclusive-dealing one." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 330, 81 S.Ct. 623, 629, 5 L.Ed.2d 580 (1961). Plaintiffs have not met their burden of proving that such a relationship exists between Fisher and its distributors.

The Code of Ethics signed by Boyle, as President of TTI (the only document signed by the plaintiffs in the record), does not contain a provision limiting its ability to sell a competitive line of snowplows. (*See* Boyle Aff. Ex. 1). The Service Center Qualifications sheet itself, which contains the prohibition, appears to be from TTSales, is unsigned, and other documents included in the same exhibit indicate that it may have been signed in November 1996 at the latest. (Boyle Aff. Ex. 4). There is deposition testimony that Fisher stopped using the sheet many years ago and that even when this document was given to distributors, many distributors regularly sold competitors' products anyway. (Murphy Dep. at 67–68). Madigan, in addition to Fisher products, sold Everest, Pathfinder and Glenhill plows, which compete with Fisher. (Madigan Dep. at 48–49, 58–59). Further, Boyle has never been directly instructed by Fisher not to sell competing products. (Boyle Dep. at 210–11). In short, plaintiffs have not met their burden of proving the existence of a "truly" exclusive dealing arrangement.

Moreover, even if plaintiffs had proven an exclusive relationship, its claim of an antitrust violation still must fail. Such relationships are not unlawful *per se* and only violate the antitrust laws if the "contract forecloses competition in a substantial share of the line of commerce involved." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. at 329, 81 S.Ct. at 629. To make this determination, the court must assess (1) "the line of commerce," (2) "the area of effective competition in the known line of commerce," and (3) "the competition foreclosed by the contract" which must "be found to constitute a substantial share of the relevant market." *Id.* at 327–28, 81 S.Ct. at 628. "[T]he opportu-

---

**14.** Clayton Act, § 3 states that:

[i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

nities for other traders to enter into or remain in that market must be significantly limited." *Id.* at 328, 81 S.Ct. at 628–29. As the United States Supreme Court has stated:

> To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Id.* at 329, 81 S.Ct. at 629. Faced with the need to prove all these complicated facts, the *only* evidence plaintiffs have submitted is the deposition testimony of Staples to the effect that he "guesses" that in 1997 Fisher had 90% of the snow plow market in Massachusetts. (*See* Pls.' Opp. at 17–18; Pls.' RF ¶ 46; Staples Dep. at 5–6). Plaintiffs have not put forth any evidence to establish the elements of their antitrust claim. Therefore, summary judgment should enter in favor of Fisher on Count V of the Complaint.

### G. *Mass. Gen. Laws ch. 93A*

█ Finally, in Count IV, the plaintiffs allege that Fisher's conduct, including its offering pretextual reasons for upgrading Madigan, taking advantage of the plaintiffs, offering the plaintiffs false assurances about the future of TTI's business, and failing to disclose its intention to upgrade Madigan violated Mass. Gen. Laws ch.

93A, § 11. (Compl. ¶¶ 34–38; Pls.' Opp. at 18–19).[15] Fisher argues that this claim fails because it is based on the same conduct underlying the other unsuccessful claims and that its conduct in these circumstances was not otherwise unfair or deceptive. (Def.'s Mem. at 33–38; Def.'s Reply Mem. at 9–10). This court agrees with Fisher and recommends that summary judgment be entered in its favor on this claim as well.

Mass. Gen. Laws ch. 93A, § 2 makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." This protection is extended to commercial parties by ch. 93A, § 11. *See Saint–Gobain Indus. Ceramics Inc. v. Wellons, Inc.*, 246 F.3d 64, 73 (1st Cir. 2001). "The legislation contains no definition of unfair or deceptive acts or practices." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 418 Mass. 737, 740, 640 N.E.2d 1101, 1103 (1994). "The standard for behavior that falls within the ch. 93A proscription is notably imprecise, encompassing any actions that 'attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce,[16] have an extortionate quality that gives it the rancid flavor of unfairness, or fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness.'" *St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis*, 262 F.3d 53, 66 (1st Cir.2001) (internal citations omitted). "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of

---

**15.** Plaintiffs also assert in a conclusory manner that Fisher destroyed documents and falsified exhibits. As detailed *supra* at note 5, these charges are not appropriately before the court at this time. Moreover, the alleged conduct is not related to the ch. 93A claim raised in the complaint which is based on the

appointment of Madigan as a full-line distributor.

**16.** The Massachusetts Supreme Judicial Court has recognized that the rhetoric of "rascality" is "uninstructive." *Mass. Employers Ins. Exch. v. Propac–Mass, Inc.*, 420 Mass. 39, 42, 648 N.E.2d 435, 438 (1995).

what may qualify for consideration as a c. 93A violation is a question of law." *Saint–Gobain v. Wellons, Inc.*, 246 F.3d at 73 (internal citations and quotations omitted). Thus, summary judgment may be appropriate based on undisputed material facts. *See Mass Cash Register v. Comtrex Sys.*, 901 F.Supp. at 425 ("Because the Court finds no tortious or otherwise unscrupulous activity on the part of [the defendant], the wrath of chapter 93A cannot be unleashed"; Court grants summary judgment in favor of defendant on ch. 93A claim).

Viewing the facts most favorably to plaintiffs, Fisher failed to disclose that it intended to appoint Madigan before the plaintiffs closed on the APA or became a Fisher distributor. There are circumstances where a failure "to disclose information which may have influenced a buyer not to enter into the transaction" may constitute a violation of ch. 93A. *USM Corp. v. Arthur D. Little Sys., Inc.*, 28 Mass.App.Ct. 108, 125, 546 N.E.2d 888, 897 (1989). Where, as here, however, there is no duty to disclose, the failure to do so does not state a claim under ch. 93A. *Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 46 (1st Cir.1995).

Moreover, the undisputed facts establish that although he had the opportunity to do so, Boyle never questioned Fisher about its intentions vis-à-vis Madigan, and never questioned Madigan about its intentions vis-à-vis purchasing plows from TTSales or TTI. Even though Boyle had serious concerns about the lack of a written distributorship agreement which defined the rights and obligations of Fisher and its distributors, and even though Boyle recognized (as evidenced by the Offset Agreement) that Fisher could appoint other distributors, he never directly broached the subject with Fisher. Under such circumstances, any failure to disclose does not, as a matter of law, rise to the level of "rascal-

ity" which would state a claim under ch. 93A. *See L.B. Corp. v. Schweitzer–Mauduit Int'l, Inc.*, 121 F.Supp.2d 147, 154 (D.Mass.2000) (failure to disclose potential contamination did not give rise to ch. 93A claim, summary judgment in favor of defendant allowed).

Similarly, the fact that Fisher elected to elevate Madigan does not state a claim under ch. 93A. As detailed above, there were no limitations, be they contractual or otherwise, on Fisher's right to appoint distributors. "As a matter of law, 'a refusal to deal, without a showing of monopolistic purpose or concerted effort to hinder free trade, is not an unfair trade practice under G.L. c. 93A, and is therefore not actionable.'" *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 16 (1st Cir.1999) (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 599, 321 N.E.2d 915, 919 (1975)). Clearly then, a decision to continue dealing, albeit with more competitors, does not rise to the level of a ch. 93A violation.

In sum, as the Massachusetts Appeals Court asserted in a statement equally applicable here:

> "[t]he plaintiffs were not commercial innocents. They never bothered to obtain a written franchise or other agreement that might bind the defendant[ ] to a fixed and more enduring commercial relationship. The parties retained the right to stop doing business with each other if a better opportunity ever presented itself. The record conveys no impression of oppressiveness .... [Under such circumstances], the plaintiffs did not make out a case for recovery under G.L. c. 93A, §§ 2(a) and 11."

*Teitelbaum v. Hallmark Cards, Inc.*, 25 Mass.App.Ct. 555, 562–63, 520 N.E.2d 1333, 1337–38 (1988) (no ch. 93A violation based on a franchisor's decision to deal with a different distributor). For these reasons, this court recommends that sum-

mary judgment be entered in favor of Fisher on Count IV of the Complaint.

## IV. CONCLUSION

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Fisher's "Motion for Summary Judgment" (Docket # 50) be ALLOWED on all Counts (I–VI) of the plaintiffs' Complaint.[17]

17. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See*

*Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 153–54, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir. 1998).